597 So.2d 276 (1992)
In re Constitutionality of SENATE JOINT RESOLUTION 2G, SPECIAL APPORTIONMENT SESSION 1992.
No. 79674.
Supreme Court of Florida.
May 13, 1992.
*277 Robert A. Butterworth, Atty. Gen., Richard E. Doran, Asst. Deputy Atty. Gen., Gerald B. Curington, Sr. Asst. Atty. Gen. and George L. Waas, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, on behalf of Atty. Gen.
Stephen N. Zack, Norman C. Powell and Scott L. Warfman, Zack, Hanzman, Ponce & Tucker, Miami, on behalf of Fla. Senate.
Kevin X. Crowley and James A. Peters, Cobb, Cole & Bell, Tallahassee, on behalf of Fla. House of Representatives.
Mark S. Levine, Tallahassee, on behalf of Simon Ferro, State Chairman, Fla. Democratic Party.
George N. Meros, Jr., Rumberger, Kirk & Caldwell, Tallahassee, and E. Thom Rumberger and Daniel J. Gerber, Rumberger, Kirk & Caldwell, Orlando, on behalf of interested parties: Miguel DeGrandy, Andy Ireland, Van B. Poole, Republican Party of Fla., Luis Rojas, Javier Souto, Alberto Cardenas, Luis Morse, Karen E. Butler, Jean Van Meter, Robert Woody, Mario Diaz-Balart, Casimer Smericki, Terry Ketchel, Rodolfo Garcia, Jr., Roberto Casas, *278 Lincoln Diaz-Balart, Justo Luis Pozo, Rey Velazquez, Alberto Gutman, Sgt. Augusta Carter, Ana M. Pinnellas and Carlos Valdes.
Larry K. White, Tallahassee, and Brenda Wright, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., on behalf of interested parties: Gwen Humphrey, Vivian Kelly, Gerald Adams, Wilmateen W. Chandler, Dr. Percy L. Goodman, Jesse L. Nipper, Moease Smith and Carolyn L. Williams.
Parker D. Thomson and Carol A. Licko, Thomson, Muraro & Razook, P.A., Miami, on behalf of Common Cause.
Charles G. Burr, Charles G. Burr, P.A., Tampa, Harry L. Lamb, Perry & Lamb, P.A., Orlando, and Dennis Courtland Hayes and Willie Abrams, NAACP Sp. Contribution Fund, Baltimore, Md., on behalf of Florida State Conference of NAACP Branches.
Henry C. Hunter and Charles E. Vanture, Tallahassee, and Rodney G. Gregory, Law Offices of Rodney G. Gregory, Jacksonville, on behalf of interested parties: Darryl Reaves, Corrine Brown and James Hargarett.
Betty T. Ferguson, President of People's Positive Action Council (UP-PAC), Miami.
GRIMES, Justice.
This is an original proceeding in which the attorney general petitions this Court for a declaratory judgment determining the validity of Senate Joint Resolution 2G apportioning the legislature of the State of Florida. We have jurisdiction under article III, section 16(c) of the Florida Constitution, which provides:
(c) JUDICIAL REVIEW OF APPORTIONMENT. Within fifteen days after the passage of the joint resolution of apportionment, the attorney general shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment. The supreme court, in accordance with its rules, shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment.
The Florida Legislature began preparing for the 1992 reapportionment in 1988. Each chamber hired separate expert technical staff and provided them with state-of-the-art computer systems. Committees on Reapportionment in both chambers were appointed in 1991 and charged with the responsibility of aiding the legislature in developing legislative and congressional plans. The House and Senate cohosted 32 public hearings throughout the state between September 19, 1991, and December 4, 1991. Their purpose was to increase public awareness on reapportionment and to receive public input prior to the development or adoption of any redistricting or reapportionment plans.
Notwithstanding, the legislature was unable to agree on a plan of legislative reapportionment during the regular 1992 session. Pursuant to article III, section 16(a) of the Florida Constitution, the governor then reconvened the legislature in a special apportionment session. During that session, Senate Joint Resolution 2G was adopted. Three days later, on April 13, 1992, the attorney general filed this petition for review of the apportionment plan. Adversary interests have filed briefs presenting their views, and the matter has been orally argued before the Court.
In analyzing the validity of the reapportionment plan, we begin by addressing the issue of the plan's validity under the equal protection standard of one person, one vote. Equal protection requires that state legislatures be apportioned in such a way that each person's vote carries the same weight  that is, that each legislator represents the same number of voters. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). This determination necessarily requires an analysis of population figures in each district.
Joint Resolution 2G apportions the state into 120 House districts and 40 Senate districts.[1] Florida's population is 12,937,926.[2] *279 Therefore, the ideal population per single-member House district is 107,816 (the total state population divided by 120 districts). The largest House district is District 80, with a population of 108,460  deviating from the ideal population by 644 people, or 0.60%. The smallest House district is District 111, with a population of 106,317  deviating from the ideal population by 1,499 people, or 1.39%. Therefore, the maximum percentage deviation between the largest and smallest number of people per representative (statistical overall range) is 1.99%.
The ideal population per single-member Senate district is 323,448 (the total state population divided by 40 districts). The largest Senate district is District 31, with a population of 324,815  deviating from the ideal population by 1,367 people, or 0.42%. The smallest Senate district is District 26, with a population of 322,007  deviating from the ideal population by 1,441 people, or 0.45%. Therefore, the maximum percentage deviation between the largest and smallest number of people per senator (statistical overall range) is 0.87%.
Although the districts do not comply precisely with the ideal population per district, mathematical exactness is not a requirement in state apportionment plans. Reynolds, 377 U.S. at 577, 84 S.Ct. at 1389 ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable."). In the plan at issue here, the deviations from ideal population are minimal. See Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 2695, 77 L.Ed.2d 214 (1983) (as a general matter, apportionment plans with a maximum population deviation under 10% fall within the category of minor deviations); Connor v. Finch, 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977). We find that the legislature has made a good-faith effort to achieve mathematical preciseness in the districts and has complied with the equal protection requirements of both the Florida and United States Constitutions.
We next address the Florida Constitution's requirement that legislative districts be "either contiguous, overlapping or identical territory." Art. III, § 16(a), Fla. Const. This Court has defined "contiguous" as "`being in actual contact: touching along a boundary or at a point.'" In re Apportionment Law, Senate Joint Resolution 1 E, 414 So.2d 1040, 1051 (Fla. 1982) (quoting Webster's New Collegiate Dictionary 245 (1973)). A district lacks contiguity "when a part is isolated from the rest by the territory of another district" or when the lands "mutually touch only at a common corner or right angle." Id.
Several parties challenge the contiguity of four Senate districts  districts 1, 8, 18, and 24. These parties assert that it is impossible to travel throughout these districts without crossing into another district. This impossibility of travel is not strictly a result of the configuration of the districts, however, but rather a result of the lack of roads in some areas or the presence of bodies of water without connecting bridges.
Although a contiguous district has been defined as one in which a person can go from any point within the district to any other point without leaving the district, such a definition does not impose a requirement of a paved, dry road connecting all parts of a district. Contiguity does not require convenience and ease of travel, or travel by terrestrial rather than marine forms of transportation. As the court noted in Mader v. Crowell, contiguity "`does not mean in contact by land. Certainly, so far as ... islands are concerned, they may be considered contiguous, although separated by wide reaches of navigable deep waters.'" 498 F. Supp. 226, 229 (M.D.Tenn. 1980) (emphasis deleted) (quoting Board of Supervisors v. Blacker, 92 Mich. 638, 52 N.W. 951, 953 (1892)). Indeed, given the number of islands included within the territory of Florida, declaring that a district *280 lacks contiguity when water separates its parts would invalidate any reapportionment plan that does not make an unconnected island a district in and of itself.
We hold, therefore, that the presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution. From our examination of the instant record, including detailed maps, we find that the districts as apportioned in the Joint Resolution satisfy the geographic requirements of the Florida Constitution.
The most contested issue before us is whether the Joint Resolution discriminates against any racial or language minority by minimizing its voting strength. The parties disagree with the standard by which we should address this issue. In order to explain their arguments, a brief historical discussion is required.
Congress enacted the Voting Rights Act of 1965 pursuant to authority granted by the Fifteenth Amendment to the United States Constitution. Section 2 of the Act provided that "[n]o voting qualifications or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973 (Supp. III 1965-1967). Section 5 of the Act prohibited any changes in voting procedures in certain designated areas of the country wherein discrimination had been most flagrant without first obtaining preclearance from the United States Attorney General or a declaratory judgment from the United States District Court for the District of Columbia. 42 U.S.C. § 1973c. The Voting Rights Act was later enlarged to cover language minorities, including Hispanics. 42 U.S.C. § 1973b(f) (1976).
From 1965 to 1980, those challenging apportionment plans under the Voting Rights Act were not required to prove deliberate discrimination in order to succeed. However, in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of the United States Supreme Court held that under the Voting Rights Act it was necessary for the plaintiffs to prove that the disputed plan was conceived as or operated as a purposeful device to further racial discrimination. In essence, Bolden required proof of what was in the minds of the legislators who enacted or retained the voting law alleged to be discriminatory.
In 1982, Congress reacted to Bolden by amending section 2 of the Voting Rights Act to eliminate the requirement of proving legislative intent to discriminate in order to establish a voting-rights claim. Pub.L. No. 97-205, 96 Stat. 131, 134 (1982). Under the amendment, section 2 was violated where the totality of circumstances revealed that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b) (1982). The extent to which members of a protected class had been elected to office was deemed to be a circumstance which may be considered. At the same time, however, Congress also provided that nothing in section 2 established a right to have members of a protected class elected in numbers equal to their proportion in population. The effect of the 1982 amendment was to substitute a "results" test for the "intent" test required by Bolden.
The 1982 amendment to the Voting Rights Act was considered by the United States Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), a case involving a section 2 challenge to certain multimember districts in North Carolina. The Court held that plaintiffs challenging a redistricting plan must prove at least the following threshold conditions: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that *281 in the absence of special circumstances, bloc voting by the white majority usually defeats the minority's preferred candidate.[3]Id. at 50-51, 106 S.Ct. at 2766. If these threshold requirements have been proven, certain objective factors must then be considered by the court in determining whether, from "the totality of the circumstances," a section 2 violation has been shown. These totality factors, which were derived from the Senate Judiciary Committee majority report that accompanied the 1982 amendment to section 2, include the following: (1) the extent of the history of official voting-related discrimination; (2) the extent of racially polarized voting; (3) the extent to which the state or political subdivision has used unusually large election districts, majority-vote requirements, anti-single-shot provisions, or other voting practices that tend to enhance the opportunity for discrimination; (4) the denial of minority access to the candidate-slating process; (5) the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder effective participation in the political process; (6) whether political campaigns have been characterized by racial appeals; (7) the extent to which members of the protected class have been elected to public office; (8) whether there is a significant lack of responsiveness by elected officials to the particularized needs of the minority group; and (9) whether the policy underlying the use of the voting qualification, standard, practice, or procedure is tenuous. Id. at 44-45, 106 S.Ct. at 2763.
In this Court's review of the 1982 legislative reapportionment, we addressed minority challenges to certain districts. In re Apportionment Law, Senate Joint Resolution 1 E. At that time, we stated that the sole question to be considered in the apportionment process was "the facial constitutional validity" of the apportionment plan. 414 So.2d at 1052. Because this was before the 1982 amendment to the Voting Rights Act, we cited City of Mobile v. Bolden for the proposition that it was necessary for the minority challenger to prove invidious discrimination by evidence which showed that the plan was motivated by an intent to discriminate. Finding no evidence in the record of purposeful discrimination, we upheld the plan against the minority challenge.
Referring to our opinion in In re Apportionment Law, Senate Joint Resolution 1 E, the proponents of the Joint Resolution suggest that claims under the federal Voting Rights Act are not facial constitutional claims and need not be considered in this proceeding. Alternatively, they argue that in light of the Florida Constitution's requirement of a ruling on the validity of the Joint Resolution within 30 days, this Court cannot go beyond a facial evaluation of the resolution. Given the complex evidentiary standard imposed on those who challenge a redistricting plan under the Voting Rights Act,[4] the proponents *282 argue that this Court cannot possibly consider such a claim at this time.
The opponents of the plan assert that we cannot fulfill our duty to determine whether the Joint Resolution complies with the federal constitution without finding that the plan meets the standards of the Voting Rights Act, which was passed to implement the federal constitution. They also argue that in view of the Supremacy Clause of the United States Constitution, we cannot constitutionally determine that the Joint Resolution complies with the federal constitution if it violates a federal statute. See Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 110 S.Ct. 2430, 2438, 110 L.Ed.2d 332 (1990) ("Federal law is enforceable in state courts ... because the Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature."). The several opponents suggest different methods by which we should resolve the matter, such as: (1) declaring the Joint Resolution facially invalid; (2) disregarding the 30-day requirement of article III, section 16(c) of the Florida Constitution, and referring the case to a judge to conduct the fact-finding analysis contemplated by the Voting Rights Act; or (3) withholding ruling and deferring to the pending federal court action on the subject.[5]
We cannot accept the narrow view that we should completely ignore the effect of the Voting Rights Act. Article III, section 16(c) requires us to determine "the validity of the apportionment." The Voting Rights Act obviously affects the validity of the Joint Resolution. Therefore, to the extent that we can do so under our own constitution, we believe we are obligated to consider the Voting Rights Act in our evaluation of the validity of the plan. At the same time, it is impossible for us to conduct the complete factual analysis contemplated by the Voting Rights Act, as interpreted in Thornburg v. Gingles, within the time constraints of article III, section 16(c). However, our analysis will include a consideration of all of the statistical data filed herein, including the breakdown of white, black, and Hispanic voting-age populations and voting registrations[6] in the legislative districts contained in the Joint Resolution and in other proposed plans,[7] none of which are disputed. We shall be guided in our analysis by the law applicable to the Voting Rights Act. Any decision which requires consideration of facts that are unavailable in our analysis will have to be resolved in subsequent litigation, as explained later in this opinion.
In addressing the minority representation under the Joint Resolution, we begin by noting that the plan includes 13 black majority population House districts that are dispersed throughout the state where large and compact populations exist. These districts are number 8 (Gadsden and Leon), number 14 (Duval), number 15 (Duval), number 39 (Orange), number 55 (Hillsborough, Manatee, and Pinellas), number 59 (Hillsborough), number 84 (Palm Beach), number 93 (Broward), number 94 (Broward), number 103 (Dade), number 104 (Dade), number 108 (Dade), and number 109 (Dade). In addition, three so-called black influence districts[8] containing black *283 populations from 29% to 33% are created: number 3 (Escambia), number 23 (Alachua and Marion), and number 118 (Dade).
Nine Hispanic majority population districts are created in the House. These districts are mainly in Dade County, since data reflects that the vast majority of the Hispanic population is geographically concentrated there. The Hispanic majority districts are number 102 (Collier and Dade), number 107 (Dade), number 110 (Dade), number 111 (Dade), number 112 (Dade), number 113 (Dade), number 114 (Dade), number 115 (Dade), and number 117 (Dade). Seven additional Hispanic influence districts are created: number 58 (Hillsborough), number 103 (Dade), number 106 (Dade), number 109 (Dade), number 116 (Dade), number 118 (Dade), and number 119 (Dade). The Hispanic population in these districts ranges from 26% to 46%.
The Joint Resolution creates 2 black majority population Senate districts: number 30 (Broward and Dade) and number 36 (Dade). There are also 3 black influence districts: number 2 (Duval, Alachua, St. Johns, Clay, and Putnam), number 14 (Orange and Seminole), and number 3 (Bay, Calhoun, Franklin, Gadsden, Gulf, Jackson, Jefferson, Leon, Liberty, Madison, and Wakulla). The black population in these districts ranges from 28% to 49%. Finally, there are 3 Hispanic majority population Senate districts: number 34 (Dade), number 37 (Dade), and number 39 (Dade).
Voting-age population statistics for these districts are also available. Black voting-age population is consistently lower than the total black population. The Hispanic voting-age population generally approximates the total Hispanic population. However, in some instances, it is slightly higher. Presumably, the voting-age population more accurately reflects current voting strength, although a current analysis based on total population could become increasingly reliable as people continue to reach voting are during the 10-year period before the next reapportionment.
The Joint Resolution provides for 11 House districts with a black voting-age population of 50.1% or higher and 2 black influence districts containing black voting-age population of 46% and 46.9%, respectively. There are 9 House districts with a Hispanic voting-age population of 63.8% or higher, and 2 additional Hispanic influence districts containing voting-age populations of 38.4% and 46.4%, respectively.
Finally, the Joint Resolution includes 2 Senate districts with a black voting-age population of 51.7% or higher and 1 district with a black voting-age population of 45%. There are also 3 Senate districts with a Hispanic voting-age population of 64.3% or higher.
The proponents also allege that there was a substantial undercount of minorities in the 1990 census and, therefore, the figures contained in the data before us do not truly represent minority voting strength. The proponents point out that the United States Department of Commerce acknowledged a substantial undercount of both blacks and Hispanics. Florida is an intervenor in a suit to compel an adjustment for the undercount.[9] In a separate action, the House has obtained an order requiring the Department of Commerce to release the adjusted data. This order has been stayed pending appeal to the Eleventh Circuit Court of Appeals.[10]
*284 We first address the issue of retrogression. Miguel DeGrandy, et al., argue that the black population and voting-age percentages have been reduced in certain Senate and House districts. However, in restructuring all of the district lines, there is bound to be some retrogression in minority voting strength in some districts. It is more appropriate to look at the overall plan to see whether or not it discriminates against minorities. The 1982 House plan contained only 7 House districts with a black population of 52% or higher and 7 districts with a Hispanic population of 58% or higher. In the Senate, the 1982 plan contained only 1 district with a black majority population and only 2 districts with a Hispanic population of 55% or higher. See In re Apportionment Law, Senate Joint Resolution 1 E. The Joint Resolution provides for the possibility of appreciably greater statewide minority representation than under the 1982 plan. Hence, there has been no retrogression in that respect, and instead minority representation has been enhanced.
We next address the issue of the effectiveness of the minority districts created by the Joint Resolution. Gwen Humphrey, et al., argue that many of the districts containing a black voting-age population of more than 50% are not as "safe" for black voters as those which could have been created. In 2 of the House districts the black voter registration is approximately 45%, and in 1 of the Senate districts the black voter registration is 46.4%. However, in the balance of the districts complained of, there is actually a higher percentage of black voter registration than there is of black voting-age population. Further, as Common Cause points out, there are several current districts where blacks comprise less than 50% of the population in the district, yet the district regularly elects black candidates.[11] On this record, we conclude that the districts which the Joint Resolution characterizes as black districts do provide blacks with an effective opportunity to elect representatives of their choice. While other plans create black majority districts with a higher percentage of black voters, this does not mean that the districts as created here are ineffective  only that districts could have been created that may have been more effective. Furthermore, there is always the risk that in creating a district where the minority population is so high as to be unnecessarily safe the minority influence will be siphoned off from other districts.
Several opponents of the plan attack the number of minority districts, contending that more could have been created. In the Senate, for example, a proposed plan submitted by DeGrandy, et al., provides 3 more black influence districts than does the Joint Resolution and 1 more Hispanic majority district.[12] In the House, a proposed plan submitted by DeGrandy provides 2 more black majority districts, 4 more black influence districts, and 2 more Hispanic majority districts.
Notwithstanding, even the proposed alternate plan which contains the highest number of minority districts does not surpass by a large margin the number of minority districts created under the Joint Resolution. Furthermore, even the opponents cannot agree on what should have been accomplished. For example, several opponents contend that in Hillsborough County, rather than fragmenting the black community among 3 districts, as the Joint Resolution does, an additional black influence district should have been created. However, the NAACP stated at oral argument that it was not in favor of creating a strong black voting district in Hillsborough *285 County because the black community there is not sufficiently compact and does not have sufficiently cohesive interests to create an effective influence district.
Some opponents accept most aspects of the Joint Resolution but contend that certain areas should have had an additional minority majority or influence district, or that some of the minority districts have a population which is insufficient to be truly effective, or that some districts have a minority population which is too high, resulting in dilution of the minority representation in surrounding districts. For example, the NAACP plan does not differ substantially from that created by the Joint Resolution. In the Senate the number of black majority districts and the number of black influence districts are the same under both plans. In the House both the NAACP and the Joint Resolution include the same number of black majority districts, but the NAACP plan creates 2 additional black influence districts. In fact, in considering just the area of Escambia County, plans submitted by the opponents ranged from splitting the county into 3 Senate districts, 1 of which has a black majority, to leaving the county intact in a single white majority district.
After carefully examining the briefs and alternative plans submitted by opponents of the Joint Resolution, we conclude that it may be that an additional Hispanic majority House district could have been created in Dade County. It may be that a stronger black influence Senate district could have been created in the Hillsborough County area and a stronger black House district could have been created in Escambia County. It may also be that the two House districts which contain a slight black majority voting-age population but only a 45% black registered voter population might have been strengthened. In fact, there may be a better plan. However, our job is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.
Given the limitations of our review, including both time constraints and the unavailability of specific factual findings, we conclude that the Joint Resolution does not discriminate against minorities. The plan is a material improvement over conditions under the 1982 plan, is not significantly less favorable to minorities than other proposed plans, and provides a substantial opportunity for minorities to influence elections and elect representatives of their choice.
Finally, several of the opponents observe that the Joint Resolution is nothing more than a gerrymandering effort by the Democratic majority of the legislature to protect Democratic incumbents.[13] We have little doubt that politics played a large part in the adoption of this plan. However, the protection of incumbents, standing alone, is not illegal, see Republican Party v. Wilder, 774 F. Supp. 400 (W.D.Va. 1991), and none of the opponents seriously contend that the Joint Resolution is invalid because of political gerrymandering.[14]
Upon consideration, we conclude that Senate Joint Resolution 2G is valid and hereby approve it as the 1992 apportionment of the Florida legislature. We acknowledge that any interested person should have the opportunity to attempt to prove that the Joint Resolution is invalid through a presentation of evidence in accordance with the Gingles analysis of the Voting Rights Act. Therefore, our holding is without prejudice to the right of any protector to question the validity of the plan by filing a petition in this Court alleging how the plan violates the Voting Rights *286 Act. In such event, this Court will provide for an expedited disposition through the appointment of a commissioner to make findings of fact. See Milton v. Smathers, 351 So.2d 24 (Fla. 1977). Thus, we retain exclusive state jurisdiction to consider any and all future proceedings relating to the validity of this apportionment plan. No motion for rehearing will be entertained.
It is so ordered.
McDONALD, BARKETT, KOGAN and HARDING, JJ., concur.
OVERTON, J., concurs with an opinion.
SHAW, C.J., dissents with an opinion.
OVERTON, Justice concurring.
I concur in the majority opinion. In doing so, I suggest there is a more efficient and less expensive process to develop a reapportionment plan. The 1978 Constitution Revision Commission proposed an amendment to the constitution that would create an independent reapportionment commission. In that proposal, the members of the commission could not be elected officials, and the commission would be the only entity involved in developing a reapportionment plan. That constitutional proposal, although defeated with all the other constitution revision commission proposals in 1978, was uniformly considered noncontroversial and a major improvement in how a reapportionment plan should be developed for this state.
I suggest that the 1978 constitutional revision proposal be reexamined by the legislature for placement on the ballot at the next general election. The reapportionment commission proposal reads as follows:
SECTION 16. Legislative and congressional reapportionment. 
(a) REAPPORTIONMENT MANDATE. In each year ending in one, the state shall be divided into: as many congressional districts as there are United States Representatives apportioned to the state; not less than thirty or more than forty senate districts; and not less than eighty or more than one hundred and twenty representative districts. All legislative districts shall be single-member districts.
(b) REAPPORTIONMENT COMMISSION. In each year ending in zero and at any other time of court-ordered reapportionment, a commission shall be established to prepare a reapportionment plan for congressional and state legislative districts. The commission shall consist of seven electors, none of whom may be elected public or party officers or employees of the state legislature. The president of the senate, the speaker of the house of representatives, the minority leader of the senate, the minority leader of the house of representatives, and the chairperson of the political party which received the second highest vote in the last gubernatorial election shall each submit to the governor and make public a list of not less than three persons. By July 1 of the same year, the governor shall appoint one person from each list and one additional person. Within thirty days after the appointments have been made, the six commissioners shall select by a vote of at least four commissioners a seventh commissioner, who shall serve as chairperson. Failure to select the seventh commissioner within the time prescribed shall constitute an impasse which shall automatically discharge the commission. A new commission shall then be appointed in the same manner as the original commission. The legislature shall establish by law the qualifications of commissioners, the procedures for their selection and for the filling of vacancies, and the duties and powers of the commission. The legislature shall appropriate funds to enable the commission to carry out its duties.
(c) REAPPORTIONMENT STANDARDS.
(1) Congressional districts and state legislative districts for each respective house shall be as nearly equal in population as is practicable, based on the population reported in the federal census taken each year ending in zero. In no case shall a congressional district have a population which varies by more than one percent from the average population of *287 all congressional districts in the state. In no case shall a single state legislative district have a population which varies by more than five percent from the average population of all districts of a house. In no case shall the average of the absolute values of the population deviations of all districts of the respective house vary by more than two percent from the average population of all districts. Any population variance must be justifiable as necessary for compliance with one or more of the other standards set forth in this section. The commission shall have the burden of justifying any variance between the population of a district and the average population of all districts.
(2) Districts shall be composed of convenient contiguous territory and, consistent with subsection (1), shall be drawn to coincide with the boundaries of local political subdivisions.
(3) Districts shall be compact in form. The aggregate length of all district boundaries shall be as short as practicable consistent with the standards contained in subsections (1) and (2). In no case shall the aggregate length of the boundaries of all districts of a house, as well as of all districts within a local political subdivision that has a population sufficient to establish two or more districts, exceed by more than five percent the shortest possible aggregate length of all the districts under any other plan that is consistent with the other standards contained in this constitution.
(4) The commission shall prepare a plan that is equitable to all electors. In preparing a plan, the commission shall not use demographic information or information about incumbent legislators, the political affiliations of registered voters, or previous election results for the purpose of favoring any political party, incumbent legislator, or any other person or group.
(5) No district shall be drawn for the purpose of diluting the voting strength of any language or racial minority group.
(d) JUDICIAL REVIEW OF APPORTIONMENT. Within 15 days after the submission of an apportionment plan by the commission, the Attorney General shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment plan. The supreme court, in accordance with its rules, shall permit adversary interests to present their views, and, within 60 days from the filing of the petition, shall enter its judgment. Should the supreme court determine the apportionment plan to be invalid in whole or in part, the governor shall reconvene the commission which shall, within 30 days, adopt an apportionment plan conforming to the judgment of the supreme court. A revised plan shall be subject to judicial review by the supreme court in the same manner as the original plan.
Florida Constitution Revision Commission Proposed Revision to the Florida Constitution of 1968 art. III, § 16, Fla. Const. (Florida Constitution Revision Commission 1978) (on file in the Florida Legislative Library, The Capitol).
SHAW, Chief Justice, dissenting.
I am unable to accept the majority's conclusion that the proposed plan passes muster under section 2 of the Voting Rights Act. I believe that Florida's longstanding and pervasive history of discrimination against minorities has combined with the presently existing districting plan to effectively deprive minority voters of an equal opportunity to elect representatives of their choice. Under the existing plan, an average of 11 blacks and 6 Hispanics have been elected to the 120-member state House at each election during the past ten years. During the same period, an average of 2 blacks and 1 Hispanic have been elected to the 40-member state Senate. The proposed plan offers little realistic hope for change.

I. BACKGROUND
Article III, section 16(c), Florida Constitution, provides the constitutional basis for the present proceeding:
(c) JUDICIAL REVIEW OF APPORTIONMENT. Within fifteen days after the passage of the joint resolution of *288 apportionment, the attorney general shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment. The supreme court, in accordance with its rules, shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment.
Art. III, § 16(c), Fla. Const.
I agree with the majority that this Court must consider section 2 of the Voting Rights Act in its present inquiry. Because this proceeding is an inquiry into the validity of a proposed plan rather than a challenge to an existing plan, however, Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), while informative, is not dispositive. Since neither our state constitution nor federal precedent provides clear guidance relative to this constitutional inquiry under the Voting Rights Act, I look to the Act itself for direction.
Section 2 of the Voting Rights Act was amended in 1982 to ban election practices that have a discriminatory effect, as well as those that have a discriminatory purpose. The amended Act reads as follows:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973 (1982) (some emphasis added).
The Senate Judiciary Committee majority report accompanying the bill of amendment sets out a nonexclusive list of factors ("Senate Report factors") that may typically be considered under the totality of the circumstances:
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. *289 206-07 (footnote omitted). The committee further provided:
While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution [of minority votes]. The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.
Id. at 207. A section 2 inquiry as envisioned by Congress ordinarily embraces a "fact-intensive test" of the "past and present reality" within the jurisdiction. Gingles, 478 U.S. at 45-46, 106 S.Ct. at 2764.

II. FACIAL VALIDITY
Although this Court cannot in the present proceeding conduct the kind of fact-intensive analysis required in a direct challenge to an existing plan under the Voting Rights Act, I believe we have sufficient information before us to carry out our constitutional inquiry into the proposed plan's validity. We should first evaluate the presently existing legislative districting plan under the Act, using the Senate Report factors as a guide and taking into account both the historical information before this Court concerning statewide discrimination in election practices and statistical information concerning the opportunity of minorities under the existing plan to elect representatives of their choice. We should then compare the existing and proposed plans to determine if deficiencies in the existing plan have been corrected or simply repeated in a nonmeaningful reshuffling of districts. We should also appraise the realistic effectiveness of the proposed black and Hispanic majority districts in light of accepted criteria concerning the correlation between total minority population, voting-age population, registered voters, and voting patterns. Using these criteria, I find the proposed plan invalid  there is simply no reasonable basis to conclude that the plan would pass muster under a full, fact-intensive section 2 challenge.
Although I am aware of section 2's disclaimer that minorities have no right under the Act to be elected in numbers equal to their proportion of the general population, the Act does nevertheless compel us as a matter of common sense to consider the bottom-line figure of elected minority representatives, so I cannot close my eyes to the fact that under the 1990 census, Florida's total population was 12,937,926, of which 1,759,533, or 14%, was black, and 1,573,318, or 12%, was Hispanic. "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered." 42 U.S.C. § 1973(b) (1982). This criterion has been recognized by the federal Court as one (along with racial bloc voting) of the two most important Senate Report factors. Gingles, 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15.

III. SENATE REPORT FACTORS

A. History of Official Discrimination

Florida has a longstanding general history of official discrimination against minorities that has influenced the electoral process. For example, our state constitution of 1885 provides:
§ 8. Poll tax
Section 8. The Legislature shall have power to make the payment of the capitation tax, a prerequisite for voting, and all such taxes received shall go into the school fund.
Art. VI, § 8, Fla. Const. (1885), reprinted in 25 Fla. Stat. Ann. 568 (1970).
§ 12. White and colored; separate schools
Section 12. White and colored children shall not be taught in the same school... .
Art. XII, § 12, Fla. Const. (1885), reprinted in 25 Fla. Stat. Ann. 617 (1970).
§ 24. Intermarriage of white persons and negroes prohibited
Section 24. All marriages between a white person and a negro, or between a white person and a person of negro descent *290 to the fourth generation, inclusive, are hereby forever prohibited.
Art. XVI, § 24, Fla. Const. (1885), reprinted in 25 Fla. Stat. Ann. 645 (1970). As recently as 1967, section 350.20, Florida Statutes, provided in part:
The Florida public service commissioners may prescribe reasonable rules and regulations relating to the separation of white and colored passengers in passenger cars being operated in this state by any railroad company or other common carrier.
Section 1.01(6), Florida Statutes (1967), further stated in part:
The words "negro," "colored," "colored persons," "mulatto" or "persons of color," when applied to persons, include every person having one-eighth or more of African or negro blood.
In addition to the state's record of general discrimination against minorities, federal precedent has addressed numerous recent discriminatory election practices in Florida, including at-large election schemes, white primaries, majority-vote requirements, and candidate filing fees. See, e.g., Solomon v. Liberty County, 899 F.2d 1012 (11th Cir.1990) (en banc), cert. denied, ___ U.S. ___, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); Tallahassee Branch of NAACP v. Leon County, 827 F.2d 1436 (11th Cir.1987), cert. denied, 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988); McMillan v. Escambia County, 748 F.2d 1037 (5th Cir.1984); NAACP v. Gadsen County School Board, 691 F.2d 978 (11th Cir.1982); James v. City of Sarasota, 611 F. Supp. 25 (M.D.Fla. 1985). Because of this history of disfranchisement, it was not until 1964 that a majority of Florida's adult black citizens were registered to vote.

B. Racially Polarized Voting

"`[R]acial polarization' exists where there is `a consistent relationship between [the] race of the voter and the way in which the voter votes,' or to put it differently, where `black voters and white voters vote differently.'" Gingles, 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21 (citation omitted). The results of Florida's legislative elections over the past ten years establish the presence of this factor. Whites consistently elected whites when they constituted a majority within a district, and blacks elected blacks.
Redistricting following the 1980 census took place in Florida in 1982. During subsequent years, blacks and Hispanics were elected to the following state legislative seats (listed in number of seats and percentage of total House and Senate seats):

 HOUSE (120 seats)
 Year Black seats Hispanic seats
 1982-84 10 (8%) 3 (2.5%)
 1984-86 10 (8%) 7 (6%)
 1986-88 11 (9%) 7 (6%)
 1988-90 10 (8%) 7 (6%)
 1990-92 12 (10%) 7 (6%)
 SENATE (40 seats)
 Year Black seats Hispanic seats
 1982-84 2 (5%) 0 (0%)
 1984-86 2 (5%) 0 (0%)
 1986-88 2 (5%) 0 (0%)
 1988-90 2 (5%) 2 (5%)
 1990-92 2 (5%) 3 (7.5%)

*291 During these years, only 5 blacks were elected to the state House from districts wherein blacks did not constitute a clear majority.[15] Two of these representatives[16] came from districts[17] wherein blacks constituted a near majority under the 1980 census (49% and 45%) and clear majority under the 1990 census (56% and 60%). The remaining 3[18] came from districts[19] wherein blacks constituted a significant portion of the population under both the 1980 (33%, 26%, and 26%) and 1990 (33%, 27%, and 29%) counts. Of these 3 districts, only 1 elected a black representative more than once, and this was apparently an anomaly.[20] During this period, no Hispanic was elected to the House from a district wherein Hispanics did not constitute a clear majority.
During these same years, only 1 black was elected to the state Senate from a district wherein blacks did not constitute a clear majority.[21] This district contained a near majority of blacks under both the 1980 (49%) and 1990 (48%) counts. No Hispanic was elected to the Senate from a district wherein Hispanics did not constitute a clear majority.
Conversely, at each election during this period, in every district wherein blacks constituted a clear or near majority under either census, voters chose to be represented by a black legislator in the House.[22] The same is true of the Senate.[23] At each election subsequent to 1982, in every district wherein Hispanics constituted a clear majority, voters chose to be represented by a Hispanic representative in the House.[24] The same is true of the Senate for elections held subsequent to 1988.[25]

C. Election of Minority Officials

Minorities have historically been under-represented in Florida politics. Although significant portions of Florida's population traditionally have been black or Hispanic, blacks were unable to elect a single representative to the state House from 1889 to 1968. No black representative to the state Senate was elected from the time of Florida's inception until ten years ago, in 1982. No Hispanic state senator was elected until four years ago, in 1988. Florida has sent no black representative to Congress in over a century. Only 1 Hispanic congressperson serves from Florida.

IV. COMPARISON OF PRESENT AND PROPOSED PLANS
Proponents of the proposed plan argue that it differs from the existing plan by providing substantially greater opportunity for minorities to elect representatives of their choice. A comparison of the two plans, however, reveals no real change when the growth of minority populations over the past decade within existing districts as demonstrated by the 1990 census is considered.[26]
*292 In redrawing district lines for the House, the legislature has created 4 additional black majority districts, eliminated 13 black influence districts, created 2 additional Hispanic majority districts, and eliminated 1 Hispanic influence district. In redrawing Senate lines, the legislature has created 1 additional black majority district, retained the same number of black influence districts, eliminated 1 Hispanic majority district, and created 2 Hispanic influence districts. Thus, while the proposed plan offers change over the existing plan, it does little to increase the opportunity for minority representation, and in some instances actually decreases it. To the extent the plan benefits minorities, the changes are minor when compared to the historical underrepresentation and substantial inability minorities in Florida have experienced in electing legislators of their choice throughout the past decade.

V. EFFECTIVENESS OF PROPOSED PLAN
In evaluating the effectiveness of districting plans in fostering the opportunity of minorities to elect representatives of their choice, courts have recognized that minority concentrations substantially above 50% total population ("super-majorities") are often required because minority populations generally have more persons below voting age than do white populations. Also, voter registration and turnout among minorities oftentimes is decreased because of the lingering effects of past discriminatory practices that may have rendered registration and voting unduly burdensome or futile. See Kimball Brace et al., Minority Voting Equality: The 65 Percent Rule in Theory and Practice, 10 Law & Pol'y 43 (1988).
Taking these factors into account, the proposed plan is seriously flawed. While the plan for the House contains 13 black majority districts based on total population, only 11 of these contain black majority voting-age populations, and only 9 contain a majority of registered black voters.[27] As to the Senate, only 1 district contains a majority of registered black voters.
Even under the best-case scenario under the proposed plan, i.e., if blacks and Hispanics elected representatives of their choice in each of the proposed districts wherein they constituted a clear or near majority based on total population (if blacks elected 13 representatives to the House and 3 senators, and Hispanics elected 9 representatives to the House and 3 senators), their representatives would still comprise only a fraction of the total these minorities make up of Florida's population. This is hardly a meaningful improvement over the existing apportionment plan.

VI. ALTERNATIVE PLANS
Numerous alternative plans were submitted to both the legislature and this Court showing that minorities are sufficiently large in numbers and geographically compact to constitute majority populations within additional districts that are reasonably configured and would give minorities significantly greater opportunity to elect representatives of their choice. For instance, alternative plan 292 provides for 15 House districts wherein blacks would constitute a majority of the total population (the proposed plan has 13). Both alternative plan 292 and the Reaves & Brown plan *293 provide for 11 House districts wherein Hispanics would constitute a majority of the total population (the proposed plan has 9). Most significant, the Reaves & Brown alternative plan provides for 6 black majority Senate districts (the proposed plan has 2), and several alternative plans (plan 275, and those submitted by Reaves & Brown, Kiser, and Common Cause) provide for 4 Hispanic majority Senate districts (the proposed plan has 3).

VII. CONCLUSION
In my opinion, opponents of the plan have successfully demonstrated that there is no reasonable basis to conclude that the plan would pass muster under a full, fact-intensive section 2 challenge. Opponents have adequately established the presence of a number of Senate Report factors and have shown the existing plan flawed. While the proposed plan offers change, it fails to significantly foster the opportunity for minorities to elect representatives of their choice. Any appearance of true positive change is illusory. Under the proposed plan, many minority citizens in Florida will be unable to elect representatives of their choice.
Based on the foregoing, I find the plan invalid.
NOTES
[1] All districts in both the House and the Senate are single-member districts.
[2] Population figures are those reported in the United States Decennial Census of 1990, upon which the legislature based the apportionment plan.
[3] A memorandum on Reapportionment Issues filed in this Court by Jon Mills of the Center for Governmental Responsibility at the University of Florida explains:

In the case of demonstrating ethnically or racially polarized voting, the part of the "totality of circumstances" test where the courts have insisted on the most rigorous analysis, at least two sets of statistical tests must be run:
a. Homogeneous or extreme case analysis of voting patterns, and
b. Ecological regression analysis of voting patterns.
The reason these two tests must be simultaneously run is that from a statistical standpoint, inference from one about the voting patterns of a district/county, or any segment of it, will be subject to the ecological fallacy, a fatal error in interpreting statistical tests. The "ecological fallacy" means that inferences about voting behavior of a large group (either majority or minority), based on a small sample of homogeneous precincts, are potentially specious. Similarly, inferences about the voting behavior of segments of the population based on area-wide analysis are equally fallacious. Simply put, the secret ballot protects the individual voter, as well as making simplistic conclusions about voting patterns impossible. Therefore, both sets of tests must be run concurrently and simultaneously, and the results of both evaluated before appropriate inferences about polarized and/or block voting can be inferred.
[4] See, e.g., Jeffers v. Clinton, 730 F. Supp. 196 (E.D.Ark. 1989) (conducting analysis of Voting Rights Act claims after hearing evidence for 12 days).
[5] DeGrandy v. Wetherell, No. TCA 92-40015-WS (N.D.Fla. filed Mar. 27, 1992).
[6] No voter registration statistics for Hispanics have been furnished.
[7] We have permitted all interested parties to file alternative apportionment plans in support of their arguments with respect to whether or not the Joint Resolution impermissibly discriminates against a minority group.
[8] Our use of the term influence districts refers to those in which the minority voting strength exceeds 25% but is less than 50%. The benefit to minorities in the creation of influence districts is subject to debate. Some courts and commentators argue that by creating "superminority" or influence districts the overall impact of the minority vote is actually diluted. Basically, according to this viewpoint, influence districts create a political apartheid, packing members of a minority into a single district in which, assuming racial bloc voting, they can never actually elect a candidate, since they are not a majority, and at the same time creating solid pockets surrounding the influence districts with no minority presence whatsoever, solidifying the power of the white majority. The counter-argument is that even without a voting majority, a district containing substantial voting strength can exert a meaningful influence on the outcome of elections and with the benefit of white crossover voting even elect minority candidates. The United States Supreme Court reserved ruling on the issue of the cognizability of a claim under the Voting Rights Act where the minority group seeks the creation of an influence district, rather than a majority district. Thornburg v. Gingles, 478 U.S. 30, 46 n. 12, 106 S.Ct. 2752, 2764 n. 12, 92 L.Ed.2d 25 (1986). Federal courts are split on the issue of whether a section 2 claim can be brought where the minority is not sufficiently large and geographically compact to create an effective majority district. Compare Turner v. Arkansas, 784 F. Supp. 553, 564 (E.D.Ark. 1991) (no actionable claim for failure to create influence district), petition for cert. filed (U.S. Apr. 8, 1992) (No. 91-1615) with Armour v. Ohio, 775 F. Supp. 1044, 1050-52 (N.D.Ohio 1991) (holding such a claim to be actionable).
[9] City of New York v. United States Dep't of Commerce, No. 88-Civ-3474 (E.D.N.Y. filed July 23, 1991).
[10] Florida House of Representatives v. United States Dep't of Commerce, No. 91-40387-WS (N.D.Fla. Oct. 10, 1991), appeal filed (11th Cir. Jan. 10, 1992) (No. 92-2022).
[11] Common Cause refers to one black representative who continues to be elected in a district with only a 27.33% black population.
[12] No Senate plan submitted by the opponents improves upon the number of black voting-age majority districts created by the Joint Resolution, although the majority districts created in some other plans do have greater voting-age majorities. In fact, the Common Cause plan creates only 1 black majority district, although it provides for 2 additional black influence districts. It must be understood, however, that our use of the term majority district refers only to population or voting-age majorities. As noted by Common Cause, districts which do not contain minority population or voting-age majorities may in fact be safe minority districts.
[13] Ironically, we have received letters from two Dade County Democratic representatives complaining that the Joint Resolution improperly dilutes the voting strengths of two compact and cohesive white areas in its effort to create more minority majority House districts.
[14] We have also received complaints that certain smaller Florida cities have been unnecessarily divided in two by the Joint Resolution. While these are legitimate concerns, in most cases they appear to be an inevitable result of the legal requirements to draw district lines in such a manner as to provide significant minority voting strength. In any event, we cannot say that the legislature's determination to divide certain cities in the manner in which it did causes the Joint Resolution to be invalid.
[15] Al Lawson, Jr., 1982-90, from District 9 (33% black under both 1980 and 1990 counts); Cynthia Chestnut, 1990, from District 23 (26% under 1980 census, and 27% under 1990 census); Tim Jamerson, 1982-90, from District 55 (49% and 56%); Bill Clark, 1982-90, from District 91 (45% and 60%); and Daryl Jones, 1990, from District 118 (26% and 29%).
[16] Tim Jamerson and Bill Clark.
[17] Districts 55 and 91.
[18] Al Lawson, Jr., Cynthia Chestnut, and Daryl Jones.
[19] Districts 9, 23, and 118.
[20] District 9 elected Al Lawson, Jr., from 1982 to 1990.
[21] Arnett Girardeau, 1982-90, from District 7 (49% black under 1980 census, and 48% under 1990).
[22] District 16, 17, 40, 55, 63, 91, 106, 107, 108 elected black representatives to the House at every election following the 1982 redistricting.
[23] Districts 7 and 36 elected black senators at every election following the 1982 redistricting.
[24] Districts 105, 109, 110, 111, 112, 113, and 115 have elected Hispanic representatives at every election from 1984 onward.
[25] Districts 33 and 40 elected Hispanic senators at every election from 1988 onward. District 34 elected a Hispanic senator at the 1990 election.
[26] The existing plan for House districts, in place since 1982, embraces 7 black majority districts under the 1980 census, 9 under the 1990 count, 12 black influence districts under the 1980 census, and 16 under the 1990 count. The plan includes 7 Hispanic majority House districts under the 1980 census, 7 under the 1990 count, 4 Hispanic influence districts under the 1980 census, and 8 under the 1990 count. As to the Senate, the existing plan embraces 1 black majority district under the 1980 census, 1 under the 1990 count, 3 black influence districts under the 1980 census, and 4 under the 1990 count. The plan includes 2 Hispanic majority Senate districts under the 1980 census, 4 under the 1990 count, 2 Hispanic influence district under the 1980 census, and none under the 1990 count.

The proposed plan for House districts embraces 13 black majority districts, 3 black influence districts, 9 Hispanic majority districts, and 7 Hispanic influence districts. The plan also includes 2 black majority Senate districts, 4 black influence districts, 3 Hispanic majority districts, and 2 Hispanic influence districts.
[27] Unfortunately, voter registration information for Hispanics under the proposed plan was unavailable.