PERRY, J.,
concurring.
While I concur fully with my colleagues in the majority, I write separately to provide the context in which we make this decision. What concerns me are line-drawers who create districts for political advantage, but disingenuously cloak their explanations in the language of protecting minority voting rights. Cf. In re Senate Joint Resolution of Legislative Apportionment 1176 (Apportionment I), 83 So.3d 597, 692-93 (Fla.2012) (Perry, J. concurring). This course of action is antithetical to the Fair Districts Amendment and the basic principles of democratic self-governance. Neither our constitution nor the Voting Rights Act implicitly condones or justifies the practice.
As explained by the United States Supreme Court, the [Voting Rights Act] “was designed by Congress to banish the blight of racial discrimination in voting,” South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), and to help effectuate the Fifteenth Amendment’s guarantee that no citizen’s right to vote shall “be denied or abridged ... on account of race, col- or, or previous condition of servitude.” Voinovich v. Quilter, 507 U.S. 146, 152, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (quoting U.S. Const. amend. XV).
Id. at 621.
Historically, the Voting Rights Act protected minority voters from attempts to dilute their voting power. Enacted in 1965, it sought to eliminate traditional disenfranchisement mechanisms like literacy tests. See Pub.L. No. 89-110, 79 Stat. 437 (1965). In response, states turned to “second-generation barriers” — the principal tool being the gerrymandering of voting districts. See Shelby Cnty., Ala. v. Holder, — U.S. -, 133 S.Ct. 2612, 2634-35, 186 L.Ed.2d 651 (2013) (Ginsburg, J., dissenting). Courts invalidated the most blatant racial gerrymanders as unconstitutional violations of the right to vote. See Gomillion v. Lightfoot, 364 U.S. 339, 348, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); see, e.g., League of United Latin American Citizens v. Perry, 548 U.S. 399, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (holding that a congressional district violated the Voting Rights Act’s prohibition on election practices or procedures with a discriminatory effect); Allen v. Va. State Bd. of Elections, *299 393 U.S. 544, 565, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (holding that the preclearance provisions of the Voting- Rights Act apply to redistricting changes).
In the decades that followed, minority Democrats and white Republicans often formed alliances during redistricting sessions.[17] Under the guise of protecting minority voters, line-drawers would group large numbers of minority voters into small numbers of districts, a practice known as “packing.” See, e.g., Voinovich v. Quitter, 507 U.S. 146, 153-54, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Consequently, the surrounding districts contained very few minority voters, an .effect known as “bleaching.” See Pamela S. Karlan, The Fire Next Time: Reapportimment After the 2000 Census, 50 Stan. L/itev. 731, 740 (1998). Minority Democrats and white Republicans who supported these plans increased the reelection prospects for individuals in both groups: minority Democrats ran in districts replete with like-minded minority voters, while white Republicans ran in districts replete with like-minded white voters. See, e.g., Hays v. Louisiana, 839 F.Supp. 1188, 1205 n. 54 (W.D.La.1993) (“Testimony at the trial revealed that [the redistricting- plan] was passed by a legislative alliance between the Black and the Republican Caucuses, historically uncommon bedfellows but,', according to expert testimony, á phenomenon occurring with increasing frequency across the country.”), vacated, 512 U.S. 1230, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994).
To understand the effect on the redistricting process, consider the example of State X, a small state comprised of fifty people. Thirty people belong to the Orange party and twenty'people belong to the Purple party. The state’s line-drawers must divide the state into five congressional districts. Drawing the lines one way— in this case, vertically down' the state— results in Orange winning 60% of the seats, and Purple winning 40% of the seats — an identical reflection of the partisan components of the state.
Now assume that the line-drawers are controlled by the Purple party.- Knowing that their party is numerically disadvantaged, population-wise,- the Purple line-drawers divide the state in an unwieldy manner, such that Purple wins 60% of the seats (despite support from only a 40% minority of the people) and Orange wins 40% of the seats (despite support from a 60% supermajority of the-people).[18]
*300 [[Image here]]
When the legislature draws congressional districts and a single party controls both legislative chambers, the party has unfettered power in the redistricting process. Partisan-controlled legislatures often create redistricting plans .that ensure the controlling members’ party, is disproportionately represented in the state’s congressional delegation in comparison to the actual political makeup of the state. In exchange for working with the controlling party, the incumbents from the non-eon-trolling party practically ensure their own reelectións.
This Court is uniquely aware of how closely divided Florida’s electorate can be. See Gore v. Harris, 772 So.2d 1243, 1247 n. 4 (Fla.2000), rev’d, Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000); see also Porter v. Bowen, 498 F.3d 1009, 1012 (9th Cir.2007) (describing Florida as a “swing state”). Florida’s political dead heat suggests that its members of Congress should be split relatively evenly between the two parties. Yet, the Republican Party holds a virtual supermajority. The Republican political advantage is, in large part, a result of the party’s influence on the redrawing of boundary lines. However, “[tjhe desire of a political party to provide its representatives with an advantage in reapportionment is not a Republican or Democratic tenet, but applies equally to both parties.” Apportionment I, 83 So.3d at 615; In re Senate Joint Resolution 2G, Special Apportionment Session 1992, 597 So.2d 276, 285 (Fla.1992) (“[S]ev-eral of the opponents observe that the Joint Resolution is nothing more than a gerrymandering effort, by the Democratic majority of the legislature to protect Democratic incumbents. We have little doubt that politics played a large part in the adoption of this plan.”) (footnote omitted).
The people of this great state passed a constitutional amendment seeking to address the errors of the past. See Apportionment I, 83 So.3d at 597. Floridians voted to add these new redistricting man *301 dates, and they “could not have spoken louder or. with more clarity.” Id. at 695 (Perry, J., concurring). “The Florida Constitution now expressly prohibits what the United States Supreme Court has in the past termed a proper, and inevitable, consideration in the apportionment process.” Id. at 616 (citations omitted). Specifically, the Fair Districts Amendment prohibits lines “drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate'in the political process or to diminish their ability to elect representatives of their choice.” Art. III, § 20(a), Fla. Const. -In other words, “the standards governing the ... apportionment process are now more stringent than the requirements under the United States Constitution and prior versions of the Florida Constitution.” Apportionment I, 83 So.3d at 604. Despite this populous mandate, those who were elected to represent the interests of the citizenry instead chose to use the undeniably gerrymandered 2002 map as the-starting point and then opted to make as few changes as possible to create maps that could pass constitutional muster.
After more than three years of litigation and appeals, even with clear instruction from this Court, League of Women Voters of Florida v. Detxner, 172 So.3d 363, 372 (Fla.2015), there is criticism that the representatives of the people have spent more than $10 million in taxpayer dollars[19] and have failed to pass' a single constitutionally-sound plan. It now falls to this Court to provide the Supervisors of Elections with a constitutionally compliant map.
Judge Lewis has worked tirelessly and diligently below to. do just. that. The efforts to paint this process as partisan or invoke the antebellum, period are an unjustified attack on the 'integrity ■ of our judicial system. Had those who were elected by the people heeded their electorate, our • involvement would never have been required.
As it stands, once.adopted, the plan we approve today increases the number of districts where minorities, both racial and ethnic, will have the opportunity to elect the representatives of their choice. The boundaries, may have, changed, but the purpose and goal of the Voting Rights Act and Florida’s Fair Districts Amendment have been better met under this plan. ■
I understand that it is nearly impossible to remove politics from an' inherently political process, and both parties have had the advantages of drawing the lines at some point in history. However, this Court is constitutionally required not to protect any individual incumbent, but. to , protect the interests .of each individual voter. To do otherwise would.be. contrary to the democratic pirinciples embodied in our constitution. . ,
Originally, the right to voté was limited to white male landowners. Others had to fight and die for the privilege to be extended to them. It is an insult to their struggle for politicians to now use that sacrifice for personal benefit. The Florida Constitution protects, the ability of minority communities to elect representatives of their choice'. See art. III, § 20, Fla. Const. That protection belongs to the minority community — not to the incumbents they choose to elect.,
QUINCE, J., concurs.

. See, e.g., Alex Larry, Democrat U.S. Rep. Corrine Brown again aligns with GOP in Florida redistricting battle, Tampa Bay Times, May 14, 2011, http://www.tampabay.com/news/ politics/natjonal/democrat-us-rep-corrinebrown-again-aligns-with-gop-in-flórida/1169453.

. This illustration is adapted from The Washington Post. Christopher Ingraham, This is the best explanation of gerrymandering you will ever see, How to steal an election: a visual guide, Wash, Post: Wonkblog, Mar. 1, 2015, https://www.washingtonpost.com/news/wonk/ wp/2015/03/01/this-is-the-bestexplanation-of-geriymandering-you-will-ever-see/.

. See, e.g,, Michael Auslen, 4 Sessions, 3 breakdowns for Florida Legislature come at a cost to taxpayers, Miami Herald, Nov. 7, 2015, hltp.7/www.miamiherald.com/news/politics-governmen1/statc-politics/article43500222. html.