601 So.2d 543 (1992)
In re CONSTITUTIONALITY OF SENATE JOINT RESOLUTION 2G, SPECIAL APPORTIONMENT SESSION 1992.
No. 79674.
Supreme Court of Florida.
June 25, 1992.
*544 Robert A. Butterworth, Atty. Gen., Richard E. Doran, Asst. Deputy Atty. Gen., Gerald B. Curington, Sr. Asst. Atty. Gen., and George L. Waas, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, for Atty. Gen.
Stephen N. Zack, Norman C. Powell and Scott L. Warfman of Zack, Hanzman, Ponce & Tucker, Miami, for Florida Senate.
Kevin X. Crowley and James A. Peters of Cobb, Cole & Bell, Tallahassee, for Florida House of Representatives.
Mark S. Levine, Tallahassee, for Simon Ferro, State Chairman, Florida Democratic Party.
George N. Meros, Jr. of Rumberger, Kirk & Caldwell, Tallahassee, and E. Thom Rumberger and Daniel J. Gerber of Rumberger, Kirk & Caldwell, Orlando, for interested parties, Miguel DeGrandy, Andy Ireland, Van B. Poole, Republican Party of Florida, Luis Rojas, Javier Souto, Alberto Cardenas, Luis Morse, Karen E. Butler, Jean Van Meter, Robert Woody, Mario Diaz-Balart, Casimer Smericki, Terry Ketchel, Rodolfo Garcia, Jr., Roberto Casas, Lincoln Diaz-Balart, Justo Luis Pozo, Rey Velazquez, Alberto Gutman, Sgt. Augusta Carter, Ana M. Pinnellas and Carlos Valdes.
Larry K. White, Tallahassee and Brenda Wright of Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., for interested parties, Gwen Humphrey, Vivian Kelly, Gerald Adams, Wilmateen W. Chandler, Dr. Percy L. Goodman, Jesse L. Nipper, Moease Smith, and Carolyn L. Williams.
Parker D. Thomson and Carol A. Licko of Thomson, Muraro & Razook, P.A., Miami, for Common Cause.
Charles G. Burr of Charles G. Burr, P.A., Tampa, Harry L. Lamb of Perry & Lamb, P.A., Orlando, and Dennis Courtland Hayes and Willie Abrams, NAACP Sp. Contribution Fund, Baltimore, Md., for Florida State Conference of NAACP Branches.
Henry C. Hunter and Charles E. Vanture, Tallahassee, and Rodney G. Gregory of the Law Offices of Rodney G. Gregory, Jacksonville, for interested parties, Darryl Reaves, Corrine Brown and James Hargarett.
Senator Pat Thomas, pro se.
Martha W. Barnett, David E. Cardwell, Scott D. Makar and Ana Cristina Martinez of Holland & Knight, Tallahassee, for Chesterfield Smith.
Charlene Miller Carres, Tallahassee, President of Florida Women's Political Caucus, Bay Area Women's Consortium, and Florida Nat. Organization for Women.
Senator S. Curtis Kiser, pro se.
GRIMES, Justice.
On May 13, 1992, this Court approved Senate Joint Resolution 2G apportioning the Legislature of the State of Florida. In re Constitutionality of Senate Joint Resolution 2G, 597 So.2d 276 (Fla. 1992). On June 16, 1992, the United States Department of Justice, pursuant to its authority under section 5 of the federal Voting Rights Act,[1] objected to the Senate apportionment plan with regard to the Hillsborough County area. Because Hillsborough County is subject to the preclearance requirements of section 5, the effect of this objection was to make the Senate apportionment plan legally unenforceable in that county. As a consequence, this Court entered an order encouraging the Legislature to adopt a plan that would meet the objection of the Justice Department. However, the Court was advised that the Governor *545 did not intend to convene the Legislature in an extraordinary apportionment session and the President of the Senate and the Speaker of the House of Representatives did not intend to convene their respective houses in an extraordinary apportionment session. Because it appeared that a legislative impasse had occurred, this Court determined to modify the Senate redistricting plan so as to resolve the objection of the Justice Department.
We acknowledge that Miguel DeGrandy, et al., have questioned this Court's jurisdiction to proceed and have asserted that jurisdiction lies in the federal district court. However, the reapportionment of state legislative bodies is not a power delegated by the Constitution of the United States to the federal government. Under the provisions of the Tenth Amendment to the United States Constitution, this is a power reserved to states. Of course, this Court is obligated to apply any applicable federal constitutional provisions and any federal statutes implementing these provisions.
The Florida Constitution places upon this Court the responsibility to review state legislative reapportionment. Art. III, § 16, Fla. Const. Pursuant to that authority, we approved the original legislative reapportionment and retained jurisdiction to entertain subsequent objections thereto. Consistent with the provisions of article III, section 16 of the Florida Constitution, we believe that it is our obligation to redraw the plan to satisfy the objection of the Justice Department now that the Legislature has declared that it is not going to do so.
A substantial number of minority persons live in the Hillsborough County area. However, the original Senate apportionment plan contained no districts in the Hillsborough County area in which the total of black and Hispanic persons constituted more than 40.1% of the voting-age population. In order to create an appreciably stronger minority district, it was evident that at the very least it would be necessary to combine minority populations in Hillsborough and Pinellas Counties. The Legislature had concluded that it was inappropriate to do this because these areas are separated by Tampa Bay and because they lack economic ties and political cohesiveness. However, the Justice Department rejected these and other legislative justifications and determined that the Senate plan with respect to the Hillsborough County area violated the Voting Rights Act. Specifically, the Justice Department pointed out that "there are no districts in which minority persons constitute a majority of the voting age population."
In order to address this problem, we permitted all interested parties to file proposed corrections to modify the Senate redistricting plan so as to resolve the objection of the Justice Department. Six corrective plans were submitted. Four of the plans created strengthened minority districts which were somewhat similar in that they combined much of the minority population of Hillsborough, Pinellas, and Manatee Counties. The voting-age populations of the strengthened minority district in these plans were as follows:

 PLAN WHITE BLACK OTHER HISPANIC
 Senator Thomas 60.4% 35.5% 4.1% 17.0%
 Senator Curt Kiser 60.2% 36.7% 3.1% 11.8%
 NAACP 59.7% 36.3% 4.0% 17.2%
 Representative Peter Wallace 60.8% 35.1% 4.1% 17.8%

However, presumably because of their dissimilar political objectives, some of these plans differed in the manner in which they redrew the districts which adjoined the strengthened minority district.[2]
*546 The fifth plan, submitted by the Florida Women's Political Caucus, et al., contained a strengthened minority district with a black voting-age population of 25.8% and a Hispanic voting-age population of 18.1%. The avowed purpose of this plan was to ensure that the redrawing of district lines would not result in a defeat of incumbent women senators.
The sixth plan was submitted by Gwen Humphrey, et al., and supported by Representative Darryl Reaves, et al. The strengthened minority district in this plan encompassed not only Hillsborough, Pinellas, and Manatee Counties, but also extended into Polk County. The voting-age population statistics for this district are as follows: white 51.2%; black 45.8%; other 3.0%; and hispanic 9.4%.
None of the plans created a district with a black majority voting-age population or a Hispanic majority voting-age population, although all of the plans except that submitted by the Florida Women's Political Caucus contained a district with a combined minority majority voting-age population. While it might be possible to create a district containing a black majority voting-age population, to do so would require extending the minority district even further into other counties. We do not believe that the Voting Rights Act requires such an extreme measure. On the other hand, we are convinced that the Justice Department will not approve a plan for the Hillsborough County area which does not contain a district in which black voters have a reasonable opportunity to elect a candidate of their choice. It is for this reason that we have selected the Humphrey-Reaves plan as best suited to accomplish this result.
Because of the ripple effect, the adoption of the corrected plan changes the boundaries of Senate districts 10, 13, 17, 20, 21, 22, 23, and 26.[3] Thus, the boundaries of districts have been altered in portions of Hillsborough, Pinellas, Manatee, Polk, Pasco, Hernando, Highlands, Hardee, and DeSoto Counties.
We recognize that the configuration of this plan is more contorted than the others because it reaches further.[4] However, none of the plans can be considered compact because in creating a strengthened minority district it is necessary to extend fingers in several directions in order to include pockets of minority voters. The dissenters suggest that Polk County black voters have little community of interest with those in Hillsborough and Pinellas Counties other than their race. That may be so, but under the law community of interest must give way to racial and ethnic fairness.
Though the NAACP plan as well as others also created a district in which the minorities as a whole amounted to more than 50% of the voting-age population, this would not necessarily mean that a minority candidate would have a reasonable chance of being elected from such district. While statistics show that in the Hillsborough County area most blacks and Hispanics vote for Democratic candidates, there is no indication that blacks and Hispanics vote for candidates of the opposite race when they are pitted against each other.
The dissenters correctly point out that in creating a stronger minority district the influence of the minority voters in the adjoining districts is reduced. However, the Justice Department seems to interpret the Voting Rights Act as favoring the creation of more districts in which minorities have the opportunity to elect minority candidates rather than the creation of more districts in which minorities have greater influence. The Humphrey-Reaves plan gives minority voters in the Hillsborough County area the *547 greatest opportunity to elect a senator of their choice.
The Senate apportionment plan as heretofore adopted is hereby amended to include the Humphrey-Reaves plan, all of which is set forth in the attached appendix.[5] No motion for rehearing will be entertained.
It is so ordered.
KOGAN and HARDING, JJ., concur.
SHAW, C.J., concurs specially with an opinion.
OVERTON and McDONALD, JJ., dissent with opinions.
BARKETT, J., dubitante with an opinion.
SHAW, Chief Justice, specially concurring.
Senate Joint Resolution 2G, the proposed reapportionment plan for the Florida legislature that was recently approved by a majority of this Court,[6] has been rejected by the United States Department of Justice ("DOJ" or "the Department") under the preclearance procedure of section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (the "Act"). In his rejection letter to the Florida Attorney General, Assistant United States Attorney General John Dunne stated:
We are unable to reach the same conclusion with regard to the Senate redistricting plan. With regard to the Hillsborough County area, the state has chosen to draw its senatorial districts such that there are no districts in which minority persons constitute a majority of the voting age population. To accomplish this result, the state chose to divide the politically cohesive minority populations in the Tampa and St. Petersburg areas. Alternative plans were presented to the legislature uniting the Tampa and St. Petersburg minority populations in order to provide minority voters an effective opportunity to elect their preferred candidate to the State Senate. Consequently, we have carefully obtained and evaluated the state's justifications for rejecting these proposals.
The state has claimed that minority voters under these alternative plans would not be able to elect a candidate of their choice in the Hillsborough area. The state further contends that even if minority voters in this area were able to elect their preferred candidate in this area, the projected influx of white population into such a district would thwart future opportunities of minority voters to elect a candidate of their choice in such a district.
We find such claims to be unsupported by the information that is before us... . [W]e have examined evidence, including evidence in the legislative record, which suggests that the state's approach to senatorial redistricting in the Hillsborough area was undertaken with an intent to protect incumbents. Such a rationale, of course, cannot justify the treatment of minority voters in this area by the State Senate plan.
In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the state has sustained its burden in this instance. Accordingly, on behalf of the Attorney General, I must object to the 1992 redistricting plan for the Florida State Senate to the extent that it incorporates the proposed configurations for the area discussed above.
Although DOJ's review was limited to only five Florida counties (Collier, Hardee, Hendry, Hillsborough, and Monroe Counties) and to only section 5 of the Act, the Department highlighted potential problems with the proposed plan in other areas and expressly withheld overall approval:
Finally, we understand that there are challenges under Section 2 of the Voting *548 Rights Act presently being considered... . In addition, some of the comments we received alluded to various concerns involving the adequacy of the plans in non-covered counties. Because our review of these plans is limited by law to the direct impact on geographic areas covered by Section 5, we did not undertake to assess the lawfulness of the legislative choices outside of Collier, Hardee, Hendry, Hillsborough and Monroe counties. We do note, however, that allegations have been raised regarding dilution of minority voting strength in an effort to protect Anglo incumbents in non-covered jurisdictions, for example, in the Pensacola-Escambia County area and the Dade County area. Because these and other legislative choices did not directly impact upon the five covered counties, they cannot be the basis of withholding preclearance of either plan. Consequently, nothing in this letter should be construed as a determination by the Attorney General regarding the non-covered jurisdictions.
Because this Court's review in the present proceeding is limited in scope to DOJ's section 5 preclearance inquiry, I concur in the majority opinion. I believe the present revision in the plan meets the objection evinced in DOJ's admittedly restricted review. I write to note, however, that I still conclude that the overall plan, including the present revision, fails under section 2 of the Act because it does not provide an equal opportunity for minorities to elect representatives of their choice to the Florida legislature, as noted in my earlier dissent. See In re Constitutionality of Senate Joint Resolution 2G, No. 79,674 (Fla. May 13, 1992) (Shaw, C.J., dissenting).
OVERTON, Justice, dissenting.
I dissent. Six plans were submitted to the Court. Four of the six were very similar in addressing the Justice Department's requirements. They were the Thomas plan, which would establish a 35.5% black minority district; the Kiser plan, which would establish a 36.7% black minority district; the NAACP plan, which would establish a 36.3% black minority district; and the Wallace plan, which would establish a 35.1% black minority district. The remaining two plans are the Humphrey plan, which would establish a 45.8% black minority district and is the only plan that reaches into Polk County and into central and northern Pinellas County, and the Florida Women's Political Caucus plan, which would establish a 25.8% black minority district. The ACLU has filed a response asking that we make no changes that would adversely affect two incumbent women senators in the Tampa Bay area. Chesterfield Smith has filed a response objecting to the adoption of any new minority district. He asserts that the adoption of any of the proposed plans would "relegate blacks, hispanics, and other minorities to permanent minority status, which is the inevitable result of the Justice Department's promotion of race-based gerrymandering."
The NAACP argued that the Humphrey plan, adopted by the majority, goes too far. The NAACP expressed its objection to the Humphrey plan by stating: "This plan's proposed minority district for the Tampa Bay area lacks geographic compactness," and that it "places virtually all black residents in the four-county area into the minority district, thereby substantially diminishing the opportunity for blacks to influence elections in the surrounding districts." Chesterfield Smith expressed a similar concern, stating that establishing "a minority access district along the shores of Tampa Bay [would] `bleach' minority voters from districts in which they have exercised some influence."
I find that the plan presented by the NAACP is an appropriate middle-ground approach to this problem. It is the fairest, given the Justice Department's demands, the geography, the community interest of the area, and the need to assure that minority interests have a voice in their local governmental entities. The Humphrey plan, adopted by the majority, effectively strips Pinellas, Hillsborough, Manatee, and Polk Counties of their black population. To illustrate, the plan will result in the three senate districts serving Pinellas *549 County being 97.0% white, 95.9% white, and 96.9% white. The plan adopted by the majority will group so many of the minority voters into one district that the minorities in these four counties will be effectively eliminated from influencing white candidates in the other senate districts in the entire four-county area. It is also interesting to note that, while the Justice Department's section 5 preclearance jurisdiction extends only to Hillsborough County, the plan adopted by the majority will have adverse effects on Pinellas, Manatee, and Polk Counties.
Finally, this district will be so spread out and gerrymandered that it will be difficult, if not impossible, to manage constituent services. Frankly, only the senator will know where the district lines are.
McDONALD, Justice, dissenting.
I regret that I cannot concur in the plan adopted by the majority. We have now seemingly interpreted the 1982 amendment to the Voting Rights Act to require districts that can be counted on to elect a minority representative to an exclusion of all other factors. Frankly, I think that the Justice Department is erroneous in its interpretation of the 1982 Voting Rights Act and in rejecting the reapportionment plan previously approved by this Court. Assuming it to be correct, however, we need not go to the extremes we have in correcting the perceived deficiency.
We are approving a district with no geographical ties or community interest. The weird configuration imposed has only one common denominator and that is a nearly fifty percent residency of African American residents. Even the NAACP disavows the plan we approve. Acceptable plans are available, but we chose the one selected solely because it provides a voting district that furnishes an increase of approximately ten percent African American voters.
Historically, the traditional base for political representation was geographical communities. These communities with cities, counties, or other previously cohesive political entities are divided or ripped asunder to accommodate the present districts. Gerrymandering and weird contiguity geography, never previously favored, are endorsed in the goal to create minority districts. I do not think that was intended.
I abhor discrimination. I resent it and oppose it. Discrimination is a two-way street, however, and traditional communities should not be the victims of it to afford special consideration to any segment of society. We can approve or devise a plan to accommodate the concerns of minorities and community values. We should do so.
BARKETT, Justice, dubitante.
I am loath to agree to any of the convoluted plans submitted under these hurried circumstances. It is unfortunate that the presuit delay in conjunction with the imminence of qualifying deadlines apparently makes it impossible to begin at the beginning or to further explore with the Justice Department a way to satisfy both community of interest and racial fairness. I think that both the majority and the dissenting views have merit. If I had to choose only among those presented, however, I would choose the plan submitted by the NAACP simply because this is the organization that has traditionally represented and promoted the position that advances all minority interests.
NOTES
[1] 42 U.S.C. § 1973c (1982).
[2] Because each district must contain approximately 323,000 people, the drawing of a stronger minority district necessarily requires the redrawing of the boundaries of nearby districts. This is known as the ripple effect.
[3] In addition, two census blocks in Okaloosa County were moved from district 7 to district 1 in order to correct a technical problem unrelated to the issue before us.
[4] We note that this configuration appears no more extreme than that of certain other districts in the original apportionment plan which was adopted by the Legislature.
[5] The appendix contains maps of the newly corrected plan as well as supporting voting data and the appropriate legal descriptions. Because of its length, the appendix need not be published in Southern Reporter.
[6] See In re Constitutionality of Senate Joint Resolution 2G, No. 79,674 (Fla. May 13, 1992).