LAWYER *v.* DEPARTMENT OF JUSTICE ET AL.

No. 95–2024.   Argued February 19, 1997—Decided June 25, 1997

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR, KENNEDY, and THOMAS, JJ., joined, *post*, p. 583.

*Robert J. Shapiro* argued the cause for appellant. With him on the briefs was *C. Martin Lawyer III, pro se.*

*Richard G. Taranto* argued the cause for the state appellees. With him on the brief were *Peter Antonacci*, Deputy

Attorney General of Florida, *George L. Waas,* Assistant Attorney General, *Donald L. Bell, Stephen N. Zack, B. Elaine New,* and *Ben H. Hill III. Irving L. Gornstein* argued the cause for the United States. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Patrick, Deputy Solicitor General Waxman, Mark L. Gross,* and *Rebecca K. Troth. Robert B. McDuff, James M. Landis, Barbara R. Arnwine, Thomas J. Henderson, Brenda Wright,* and *Todd A. Cox* filed a brief for appellees Senator James T. Hargrett, Jr., et al.*

JUSTICE SOUTER delivered the opinion of the Court.

Appellant was one of several plaintiffs in this suit challenging the configuration of a Florida legislative district under the Equal Protection Clause. All parties except appellant reached a provisional settlement agreement and, after a fairness hearing, a three-judge District Court approved the remedial districting plan proposed in the agreement. Appellant claims that the District Court acted without giving the State an adequate opportunity to make its own redistricting choice by approving the remedial plan without first adjudicating the legality of the original plan, that the court had no authority to approve any settlement over his objection, and that the remedial plan violates the Constitution. We hold that the State exercised the choice to which it was entitled under our cases, that appellant has no right to block the settlement, and that he has failed to point up any unconstitutionality in the plan proposed.

I

After the 1990 Decennial Census, the Florida Legislature adopted a reapportionment plan for Florida's 40 Senate districts and 120 House districts. Following the procedure for

---

*\*Robinson O. Everett* filed a brief for Americans for the Defense of Constitutional Rights, Inc., as *amicus curiae.*

reapportionment set forth in the State Constitution, see Fla. Const., Art. III, § 16(c) (1970), the attorney general of Florida petitioned the State Supreme Court for a declaration that the plan comported with state and federal law. That court approved the redistricting plan, while noting that time constraints imposed by the State Constitution precluded a full review of objections raised to the plan under § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973. The court retained jurisdiction to entertain further objections to the plan. See *In re Constitutionality of Senate Joint Resolution 2G*, 597 So. 2d 276, 285–286 (Fla.), amended, 601 So. 2d 543 (Fla. 1992); *Johnson* v. *De Grandy*, 512 U. S. 997, 1001 (1994).

Since five Florida counties, including Hillsborough County where the city of Tampa is located, are covered jurisdictions under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, see 28 CFR pt. 51, App. (1996); see also *Johnson, supra,* at 1001, n. 2, the state attorney general submitted the redistricting plan to the United States Department of Justice for preclearance. On June 16, 1992, the Department declined to preclear the proposed State Senate districts, on the grounds that the redistricting plan divided "politically cohesive minority populations" in the Hillsborough County area and failed to create a majority-minority district in that region. Letter from Assistant United States Attorney General John Dunne to Florida Attorney General Robert A. Butterworth (quoted in *In re Constitutionality of Senate Joint Resolution 2G, supra,* at 547 (Shaw, C. J., specially concurring)); see also *De Grandy* v. *Wetherell,* 815 F. Supp. 1550, 1556 (ND Fla. 1992), aff'd in part and rev'd in part, *Johnson* v. *De Grandy, supra.*

The Supreme Court of Florida then entered an order encouraging the state legislature to adopt a new plan to address the Justice Department's objection, and noting that if the legislature failed to act, the court itself would adopt a reapportionment plan. See 815 F. Supp., at 1556; see also

601 So. 2d, at 544–545. The state court was advised that the Governor had no intent to convene the legislature in extraordinary session and that neither the President of the Senate nor the Speaker of the House of Representatives would convene his respective House. *Ibid.;* see also 815 F. Supp., at 1556. The court concluded that a legislative impasse had occurred and, invoking authority under state law, revised the Senate redistricting plan to address the Justice Department's objection. 601 So. 2d, at 545.

The amended plan, known as Plan 330, called for an irregularly shaped Senate District 21, with a voting-age population 45.8% black and 9.4% Hispanic and comprising portions of four counties in the Tampa Bay area. *Id.,* at 546. The district included the central portions of Tampa in Hillsborough County, the eastern shore of Tampa Bay running south to Bradenton in Manatee County, central portions of St. Petersburg in Pinellas County, a narrow projection eastward through parts of Hillsborough and Polk Counties, and a narrow finger running north from St. Petersburg to Clearwater. See Juris. Statement 29a. Although the State Supreme Court acknowledged that the district was "more contorted" than other possible plans and that black residents in different parts of the district might have little in common besides their race, it decided that such concerns "must give way to racial and ethnic fairness." See 601 So. 2d, at 546. Elections were held under Plan 330 in 1992 and 1994.[1]

On April 14, 1994, appellant and five other residents of Hillsborough County filed this suit in the District Court invoking jurisdiction under 28 U. S. C. §§ 1331, 1343, and 2201, *et seq.,* naming the State of Florida, its attorney general, and the United States Department of Justice as defendants, and alleging that District 21 in Plan 330 violated the Equal Pro-

---

[1] In separate litigation, we rejected § 2 vote dilution claims attacking certain Senate districts in the Miami and Pensacola areas created by the legislature's redistricting plan (as modified by the State Supreme Court through Plan 330). See *Johnson v. De Grandy,* 512 U. S. 997 (1994).

tection Clause. The plaintiffs sought declaratory and injunctive relief, including an order requiring Florida to reconfigure the district. See App. 14. A three-judge District Court was convened and ultimately permitted intervention by the State Senate, House of Representatives, Secretary of State, District 21 Senator James T. Hargrett, Jr., and a group of black and Hispanic voters residing in District 21. Record 33, 78; 159 Tr. 25, 30 (Sept. 27, 1995).

At a status conference held on July 6, 1995, shortly after we decided *Miller* v. *Johnson*, 515 U. S. 900 (1995), all parties agreed to the appointment of a mediator to seek resolution of the suit,[2] see Record 78, at 2; 134 Tr. 13, 14, 16 (July 6, 1995), though pretrial proceedings continued during the ensuing mediation. After the mediator declared an impasse in late October, see 166 Tr. 8 (Oct. 26, 1995), the parties continued discussions on their own and on November 2, 1995, filed with the District Court a settlement agreement signed on behalf of all parties except appellant. App. 17–21. The agreement noted that while the defendants and defendant-intervenors denied the plaintiffs' claims that District 21 was unconstitutional, all parties to the settlement concurred that "there is a reasonable factual and legal basis for the plaintiffs' claim." *Id.*, at 17. The agreement proposed revising District 21 under a new plan, called Plan 386, which would be subject to public comment and, if approved by the District Court after a public hearing, would be used in state elections unless Florida adopted a new plan. *Id.*, at 18–19. District

---

[2] At the time, the District Court had permitted the Florida Senate to intervene, see Record 33, but had yet to rule on motions to intervene from Senator Hargrett and from the group of minority voters in District 21. The District Court indicated that it intended to grant all pending motions to intervene, and treated prospective intervenors as parties. 134 Tr. 4 (July 6, 1995). The House of Representatives had yet to file a motion to intervene, but was represented at the status conference and indicated its intention to file a motion to intervene. *Id.*, at 24. No one at the status conference objected to submitting the matter to mediation. The Secretary of State was not represented at the conference.

21, as revised in Plan 386, would no longer extend into Polk County or north toward Clearwater, would have a boundary length decreased by 58%, and would include a resident black voting-age population reduced from 45.0% to 36.2%. *Id.*, at 25, 40. The proposed district would cover portions of three counties instead of four and continue to include land on both sides of Tampa Bay. Record 169, attachment 4.

At a status conference held the same day the parties filed the settlement agreement, the District Court sought and received specific assurances from lawyers for the President of the Senate and the Speaker of the House that they were authorized to represent their respective government bodies in the litigation and enter into the settlement proposed. 180 Tr. 23–24 (Nov. 2, 1995). Appellant argued that the District Court was required to hold Plan 330 unconstitutional before it could adopt a new districting plan, see *id.*, at 16, but the District Court disagreed, noting that "there is simply not a litigable issue with respect to what we have for shorthand purposes referred to as liability and we ought simply then to proceed . . . to resolve the issue of the fairness of this proposed settlement and entertain any objections [concerning it]." *Id.*, at 26.

The District Court scheduled a hearing on the proposed plan for November 20, giving notice in 13 area newspapers and making details of the plan available for review in the clerk's office. See App. 161. Before the hearing, the settling parties submitted evidence including affidavits and declarations addressing the factors considered in revising District 21, Record 188, and appellant submitted his own remedial plan for a District 21 wholly contained within Hillsborough County, Record 172, at A4. At the hearing, counsel for the State Senate summarized the prehearing filings submitted by proponents of the settlement and the rationale behind the agreement. App. 160–172. The District Court denied appellant's motion for ruling on his motion for summary judgment on the legality of Plan 330, saying that "[i]t makes

no difference whether we grant the motion or not. . . . [I]f we granted your motion, we would be in this precise posture we are in now." *Id.*, at 173. Appellant then argued that District 21, as redrawn in Plan 386, would still be unconstitutional because only race could explain its contours, see *id.*, at 175–188, and counsel for a former state legislator spoke to the same effect, *id.*, at 188–190.

On March 19, 1996, the District Court approved the settlement. See 920 F. Supp. 1248, 1257 (MD Fla. 1996). The panel majority first held that it was not obliged to find the existing District 21 unconstitutional in order to approve the settlement. While recognizing the need to "guard against any disingenuous adventures" by litigants, *id.*, at 1252, n. 2, the majority noted that a State should not be deprived of the opportunity to avoid "an expensive and protracted contest and the possibility of an adverse and disruptive adjudication" by a rule insisting on "a public *mea culpa*" as the sole condition for dispensing with "a dispositive, specific determination of the controlling constitutional issue." *Id.*, at 1252, and n. 2. To balance the competing interests, the court required a showing of a substantial "evidentiary and legal" basis for the plaintiffs' claim before the settlement would be approved, *id.*, at 1252, and it held the standard satisfied. "Each party either states unequivocally that existing District 21 is unconstitutionally configured or concedes, for purposes of settlement, that the plaintiffs have established *prima facie* unconstitutionality." *Id.*, at 1253, n. 3. The majority found that the "boundaries of current District 21 are markedly uneven and, in some respects, extraordinary," *id.*, at 1253, and that the district "bears at least some of the conspicuous signs of a racially conscious contrivance," *id.*, at 1255.

The District Court then turned to the merits of Plan 386 to determine whether its formation had been "dominated by the single-minded focus" on race that it understood to be constitutionally forbidden under *Miller.* 920 F. Supp., at

1254. The court observed that the November 20 hearing "produced but two dissenters, plaintiff Lawyer and a former state Senator, both of whom neither presented relevant evidence nor offered germane legal argument." *Id.*, at 1255. The District Court concluded that a "constitutional objection to the proposed District 21 is not established. In its shape and composition, proposed District 21 is, all said and done, demonstrably benign and satisfactorily tidy, especially given the prevailing geography." *Ibid.* The court noted that the new district's percentage of minority residents would approximate the racial features of the region surrounding Tampa Bay better than Plan 330 did, that the district's boundaries would be "less strained and irregular" than those in Plan 330, and that all candidates, regardless of race, would have an opportunity to seek office, with "both a fair chance to win and the usual risk of defeat." *Id.*, at 1255, 1256.

Chief Judge Tjoflat concurred specially. He agreed that Plan 386 was constitutional but thought that the new plan could not be approved without a judicial determination that Plan 330 was unconstitutional, as he concluded it was. *Id.*, at 1256–1257.

We noted probable jurisdiction, 519 U. S. 926 (1996), and now affirm.

## II

### A

Appellant argues that the District Court erred in approving the settlement agreement without formally holding Plan 330 unconstitutional, thereby denying the State's legislature and Supreme Court the opportunity to devise a new redistricting plan.[3] See Brief for Appellant 23, 32–33. Appel-

---

[3] We reject appellees' contention that appellant failed to preserve this claim for appeal. Appellant argued below that the District Court should rule on the legality of Plan 330 before approving a remedial plan, see, *e. g.*, Record 173, and appellant's statements asking that the state legislature and Supreme Court be given the opportunity to redistrict following a find-

lant relies on *Growe* v. *Emison*, 507 U. S. 25 (1993), in which we recognized that " 'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court' [and that] [a]bsent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state apportionment nor permit federal litigation to be used to impede it." *Id.*, at 34 (quoting *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975)). Appellant cites *Wise* v. *Lipscomb*, 437 U. S. 535 (1978), for the proposition that when a federal court declares an existing apportionment plan unconstitutional, it should, if possible, afford "a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than . . . devise and order into effect its own plan." *Id.*, at 540 (opinion of White, J.). Appellant claims that the District Court's approval of the settlement agreement without first holding Plan 330 unconstitutional impaired the State's interest in exercising "primary responsibility for apportionment of [its] federal congressional and state legislative districts," *Growe, supra,* at 34, and had the derivative effect of "eviscerat[ing] the individual rights of" appellant, as a citizen and voter, to "the liberties derived from the diffusion of sovereign power . . . to representative state government," Brief for Appellant 26.

The substance of what appellant claims as a right to the benefit of political diffusion is nothing other than the rule declared in the cases he cites, that state redistricting responsibility should be accorded primacy to the extent possible when a federal court exercises remedial power. See *Growe,* 507 U. S., at 34. A State should be given the opportunity to make its own redistricting decisions so long as that is practically possible and the State chooses to take the opportunity.

---

ing of liability fairly encompass the claim he presents here. See 166 Tr. 30–31, 36–37, 39, 40 (Oct. 26, 1995); 180 Tr. 15–16 (Nov. 2, 1995).

*Ibid.* When it does take the opportunity, the discretion of the federal court is limited except to the extent that the plan itself runs afoul of federal law.

In this case, the State has selected its opportunity by entering into the settlement agreement, which for reasons set out below in Part II–B it had every right to do. And it has availed itself of that opportunity by proposing a plan as embodied in the settlement agreement. There can be no question on the present record that proponents of the plan included counsel authorized to represent the State itself, and there is no reason to suppose that the State's attorney general lacked authority to propose a plan as an incident of his authority to represent the State in this litigation.[4] The evidence, indeed, was entirely in his favor. The participation of counsel for each legislative chamber confirmed both the continuing refusal of the legislature to address the issue in

---

[4] The dissent argues that Article III, § 16, of the Florida Constitution provides the exclusive means by which redistricting can take place. See *post*, at 585–586, and n. 2. But this article in terms provides only that the state legislature is bound to redistrict within a certain time after each decennial census, for which it may be required to convene. See Fla. Const., Art. III, § 16(a). The dissent says that the state legislature is "implicitly *authorized* to reapportion" after an existing plan is held unconstitutional and, further, that the Supreme Court of Florida has "by implication" the authority to redraw districts in the event a federal court invalidates a redistricting plan on constitutional grounds. See *post*, at 585–586, n. 2. We disagree on this question of state law only insofar as the dissent views this implicit authority to limit the broad discretion possessed by the attorney general of Florida in representing the State in litigation. See, *e. g., Ervin* v. *Collins*, 85 So. 2d 852, 854 (Fla. 1956) (noting that, under Florida law, "the Attorney General as the chief law officer of the state and absent express legislative restriction to the contrary, may exercise his power and authority in the premises [the power to litigate] as the public interest may require"); see also *State ex rel. Shevin* v. *Yarborough*, 257 So. 2d 891, 894–896 (Fla. 1972) (Ervin, J., specially concurring). Absent a state-court determination to the contrary, we do not see Article III, § 16, as placing the attorney general's settling authority in doubt, over against his representation to the contrary.

formal session and the authority of the attorney general to propose the settlement plan on the State's behalf.[5]

On these facts, the District Court's approval of the settlement agreement was entirely consistent with the principles underlying our cases that have granted relief on the ground that a district court had failed to respect the affected government's entitlement to originate its own redistricting policy. Since the State, through its attorney general, has taken advantage of the option recognized in *Growe* and *Wise* to make redistricting decisions in the first instance, there are no reasons in those cases to burden its exercise of choice by requiring a formal adjudication of unconstitutionality.

## B

We find no merit, either, in appellant's apparently distinct claim that, regardless of any effect on the State's districting responsibility, the District Court was bound to adjudicate liability before settlement because appellant did not agree to settle. See Brief for Appellant 27. "It has never been supposed that one party—whether an original party, a party

---

[5] The District Court indicated that it would look to the Florida House and Senate as an initial matter to fashion any new districting plan, see Tr. 14, 18–19, 21–22 (Sept. 27, 1995), and directed the state appellees to file a monthly "report informing the Court of any formal actions initiated by any public official or branch of government regarding Florida's senatorial 'reapportionment plan.'" Record 78, at 5. The Florida Senate filed such status reports as directed, indicating that apart from the ongoing litigation, no formal actions had been initiated by any public official or branch of state government regarding Florida's senatorial plan. Record 121, 141, 160.

The dissent challenges the authority of those representing the State House and Senate to speak for those bodies and further claims that even if they were authorized, the District Court was required to "demand clearer credentials" on their part. See *post*, at 586. However this may be, the State was represented by the attorney general and it is by virtue of his agreement as counsel that the State was a party to the agreement. The settlement and subsequent judgment do not, of course, prevent the state legislature from redistricting yet again. See App. 19.

that was joined later, or an intervenor—could preclude other parties from settling their own disputes." *Firefighters* v. *Cleveland,* 478 U. S. 501, 528–529 (1986).[6]    While appellant was entitled to present evidence and have his objections heard at the hearing to consider approval of the agreement, he "does not have power to block the decree merely by withholding [his] consent." *Id.,* at 529; cf. 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1797.1, p. 412 (2d ed. 1986) (fact of opposition does not necessitate disapproval of class-action settlement under Federal Rule of Civil Procedure 23).    While a settlement agreement subject to court approval in a nonclass action may not impose duties or obligations on an unconsenting party or "dispose" of his claims, see *Firefighters, supra,* at 529, the agreement here did none of those things.    It disposed of appellant's claim not in the forbidden sense of cutting him off from a remedy to which he was entitled, but only in the legitimate sense of granting him an element of the very relief he had sought. As a remedy for what appellant claimed to be an unconstitutional plan he had requested the elimination of that plan, and the settlement and decree gave him that relief.    To afford him a right to the formality of a decree in addition to the substance of the relief sought would be to allow a sore winner to obscure the point of the suit.    In most civil litigation, and in this suit in particular, "the judicial decree is not the end but the means.    At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces . . . .    The real value of the judicial pronouncement—what makes it a proper judi-

---

[6] Notwithstanding the dissent's claim, see *post,* at 584, nothing in *Firefighters* limits its rule to remedial consent decrees that follow an adjudication of liability.    To the contrary, the holding in *Firefighters* was expressly based on the principle that "it is the parties' agreement that serves as the source of the court's authority to enter any [consent] judgment at all," 478 U. S., at 522, and our opinion in that case makes no reference to any findings of liability.

cial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt* v. *Helms,* 482 U. S. 755, 761 (1987).

Appellant, of course, wanted something more than being rid of Plan 330, for he wanted a new plan that would be constitutional. But insofar as he would have been entitled to that following a formal decree of the court, he is now in the same position he would have enjoyed if he had had such a decree: his views on the merits of the proposed plan were heard, and his right to attack it in this appeal is entirely unimpaired. To the extent that he claims anything more, he is trying to do what we have previously said he may not do: to demand an adjudication that the State of Florida, represented by the attorney general, could indeed have demanded, see *Growe,* 507 U. S., at 34; *Wise,* 437 U. S., at 540 (opinion of White, J.), but instead waived.

## III

The District Court concluded that Plan 386 did not subordinate traditional districting principles to race.[7] See 920 F. Supp., at 1254–1255. That finding is subject to review for clear error, see *Miller,* 515 U. S., at 915–917, of which we find none.

The District Court looked to the shape and composition of District 21 as redrawn in Plan 386 and found them "demonstrably benign and satisfactorily tidy." 920 F. Supp., at 1255. The district is located entirely in the Tampa Bay area, has an end-to-end distance no greater than that of most Flor-

---

[7] There is no merit to appellant's contention that the District Court failed to adjudicate the constitutionality of District 21. See Brief for Appellant 35. The District Court noted the deference due the State, and expressly held Plan 386 to be constitutional. 920 F. Supp. 1248, 1255, 1256 (MD Fla. 1996) ("Plan 386 passes any pertinent test of constitutionality and fairness").

ida Senate districts,[8] and in shape does not stand out as different from numerous other Florida House and Senate districts. See App. 26, 60–75. While District 21 crosses a body of water and encompasses portions of three counties, evidence submitted showed that both features are common characteristics of Florida legislative districts, being products of the State's geography and the fact that 40 Senate districts are superimposed on 67 counties. See id., at 28, 32–33.[9]

Addressing composition, the District Court found that the residents of District 21 "regard themselves as a community." 920 F. Supp., at 1255. Evidence indicated that District 21 comprises a predominantly urban, low-income population, the poorest of the nine districts in the Tampa Bay region and among the poorest districts in the State, whose white and black members alike share a similarly depressed economic condition, see App. 30–31, 49–51, and interests that reflect it, id., at 149–154. The fact that District 21 under Plan 386 is not a majority black district, the black voting-age population being 36.2%, supports the District Court's finding that the district is not a "safe" one for black-preferred candidates, but one that "offers to any candidate, without regard to race, the opportunity" to seek and be elected to office. 920 F. Supp., at 1256.

---

[8] The distance is 50 .miles and record evidence indicates that only 15 of the 40 Senate districts in Florida cover less distance from end-to-end. See App. 26.

[9] The Supreme Court of Florida has held that the presence in a district of a body of water, even without a connecting bridge and even if such districting necessitates land travel outside the district to reach other parts of the district, "does not violate this Court's standard for determining contiguity under the Florida Constitution." In re Constitutionality of Senate Joint Resolution 2G, 597 So. 2d 276, 280 (Fla. 1992).

In addition, only 9 of the State's 40 Senate districts are located within a single county, and 5 of those are within Dade County. See App. 33. Multicounty districting also increases the number of legislators who can speak for each county, a districting goal traditionally pursued in the State. See id., at 32, and n. 7.

Based on these and other considerations,[10] the District Court concluded that traditional districting principles had not been subordinated to race in drawing revised District 21. Appellant calls this finding clearly erroneous, charging that District 21 encompasses more than one county, crosses a body of water, is irregular in shape, lacks compactness, and contains a percentage of black voters significantly higher than the overall percentage of black voters in Hillsborough, Manatee, and Pinellas Counties. Brief for Appellant 40–45. Appellant's first four points ignore unrefuted evidence showing that on each of these points District 21 is no different from what Florida's traditional districting principles could be expected to produce. See *supra*, at 580–581. As to appellant's final point, we have never suggested that the percentage of black residents in a district may not exceed the percentage of black residents in any of the counties from which the district is created, and have never recognized similar racial composition of different political districts as being necessary to avoid an inference of racial gerrymandering in any one of them. Since districting can be difficult, after all, just because racial composition varies from place to place, and counties and voting districts do not depend on common principles of size and location, facts about the one do not as such necessarily entail conclusions about the other.

In short, the evidence amply supports the trial court's views that race did not predominate over Florida's traditional districting principles in drawing Plan 386. Appellant has provided nothing that calls that conclusion into question, much less that points to any clear error.

---

[10] Record evidence indicates that the design of revised District 21 was also affected by the need to satisfy one-person, one-vote requirements, App. 28, the desire to retain the existing partisan balance in the Senate, *id.*, at 31, and the desire to avoid out-of-cycle elections, *id.*, at 28–29. See also *In re Apportionment Law*, 414 So. 2d 1040, 1047–1050 (Fla. 1982) (special elections must be held when district boundaries are changed, disrupting staggered Senate terms).

We accordingly affirm the decision of the District Court.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

The Court today affirms a Federal District Court's redrawing of Florida Senate District 21, despite the fact that the District Court never determined that District 21 was unconstitutional, and never gave the State an opportunity to do its own redrawing of the district to remedy whatever unconstitutional features it contained. In my view, the District Court's actions represent an unprecedented intrusion upon state sovereignty.

I

The District Court held that it could exercise its authority under the Fourteenth Amendment to "compel the nullification and re-establishment of state legislative boundaries" without finding a violation of the Fourteenth Amendment, so long as "the case presents a sufficient evidentiary and legal basis to warrant the *bona fide* intervention of a federal court into matters typically reserved to a state." 920 F. Supp. 1248, 1251–1252 (MD Fla. 1996). Although acknowledging that the "'[d]efendants and defendant-intervenors deny these assertions [of unconstitutionality],'" *id.*, at 1252–1253, n. 3 (quoting Settlement Agreement), the District Court determined that the claim that District 21 was unconstitutional was "fairly litigable," *id.*, at 1253, n. 3, and found this enough to justify its reapportionment order.

The only authority cited by the District Court for the proposition that a court can mandate a remedy without finding liability is JUSTICE O'CONNOR's concurring opinion in *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 284 (1986). But that opinion has no bearing on the present case. It dealt with the question whether a school board could, consistent with the Constitution, implement an affirmative-action pro-

gram without first making contemporaneous findings that such a program is justified by specific instances of past discrimination. *Id.*, at 289–291. Quite obviously, whether a State may take *voluntary* action without first determining that it has violated the law has nothing to do with whether a federal court may *impose* a remedy without first determining that the State has violated the law.

The Court evidently believes that an adjudication of unconstitutionality of District 21 was unnecessary here because the State entered into a consent agreement accepting judicial imposition of Plan 386. For this proposition it relies upon *Firefighters* v. *Cleveland*, 478 U. S. 501 (1986), which said that "it is the parties' agreement that serves as the source of the [District Court's] authority to enter . . . judgment . . . ." *Id.*, at 522. However, that passage from *Firefighters* is of no help to the Court—even putting aside the fact that the "agreement" there at issue, unlike the one here, was an agreement to remedy unlawful conduct (a "pattern of racial discrimination") that *had been adjudged, id.*, at 506, 511–512.[1] *Firefighters* was a Title VII action by minority firefighters, alleging that the city discriminated against them in promotions. A union representing the majority of the city's firefighters intervened as a party-plaintiff and objected to the settlement, contending, among other things, that its consent was required in order for the District Court to enter a consent decree. We disagreed. The minority firefighters and the city, we said, could have reached an out-of-court agreement to resolve their dispute. See *id.*, at 522–523, and

---

[1] I am puzzled by the Court's assertion that "our opinion in *[Firefighters]* makes no reference to any findings of liability." *Ante*, at 579, n. 6. We said: "Judge Lambros found that '[t]he documents, statistics, and testimony presented at [the] hearings reveal a historical pattern of racial discrimination in the promotions in the City of Cleveland Fire Department.'" *Firefighters*, 478 U. S., at 511–512 (quoting *Vanguards of Cleveland* v. *Cleveland*, Civ. Action C–80–1964 (ND Ohio, Jan. 31, 1983), reprinted in Brief in Opposition in *Firefighters* v. *Cleveland*, O. T. 1986, No. 84–1999, pp. A3–A4).

n. 13. "[T]he choice of an enforcement scheme—whether to rely on contractual remedies or to have an agreement entered as a consent decree—is itself made voluntarily by the parties." *Id.*, at 523.

In today's case, by contrast, neither the appellant nor the other original plaintiffs (now appellees) could have concluded a binding out-of-court "redistricting agreement" with representatives of the Florida Legislature, or with the state attorney general—and the Court does not contend otherwise. The Florida Constitution, Art. III, § 16, requires the legislature to draw districts "by joint resolution," and provides no authority for the attorney general to do so.[2] Any "redis-

---

[2] The Florida Legislature is explicitly *required* to reapportion "at its regular session in the second year following each decennial census." Fla. Const., Art. III, § 16(a). It seems obvious that the legislature is implicitly *authorized* to reapportion when its prior reapportionment has been held unconstitutional. See *In re Constitutionality of Senate Joint Resolution 2G*, 601 So. 2d 543, 544 (Fla. 1992); Tr. 29–30 (July 6, 1995) (view of counsel for the Florida House of Representatives); Record 93, at 2 (view of District 21's incumbent Senator). I cannot imagine any basis for asserting that anyone else, such as the attorney general, has authority to reapportion (by exercising his "settling authority," *ante*, at 577, n. 4), when the State's last reapportionment has *not* been invalidated. While the Court is correct that the attorney general has broad discretion in representing Florida in litigation, see *ibid.*, neither the two cases it cites nor any I could find comes even close to permitting the attorney general to agree with a private citizen to redistrict the State. The Court also asserts, without citation, that "counsel for each legislative chamber confirmed . . . the authority of the attorney general to propose the settlement plan on the State's behalf." *Ante*, at 577–578. I am unaware of any such confirmation, and the record actually suggests there was none. See Tr. 29–30 (July 6, 1995) (view of counsel for the Florida House of Representatives); Record 93, at 2 (view of District 21's incumbent Senator).

Moreover, under the Florida Constitution the prescribed body to reapportion when the legislature has failed to do so is the Florida Supreme Court. The Florida Constitution itself states this explicitly with regard to the legislature's failure to act after the decennial census, Fla. Const., Art. III, § 16; and the Florida Supreme Court has held that it has authority to reapportion (absent legislative action) in the event of Justice Department refusal of preclearance, and hence by implication in the event of

tricting agreement" entered into by these officials with individual voters would obviously be null and void. And a court decree that does not purport to be in remediation of an adjudged violation of law cannot make it binding. See *Firefighters, supra,* at 522–523. See also, *e. g., Perkins* v. *Chicago Heights,* 47 F. 3d 212, 216 (CA7 1995).

These principles would suffice to invalidate an unauthorized private agreement as the basis for a federal judicial decree in even the ordinary case, but they should apply even more rigorously to an agreement purportedly supporting a federal judicial decree of state reapportionment, which we have described as an "unwelcome obligation," *Connor* v. *Finch,* 431 U. S. 407, 415 (1977), that should be undertaken by a district court only as a last resort, see, *e. g., White* v. *Weiser,* 412 U. S. 783 (1973). Indeed, even if it were possible for the Florida Legislature to authorize two of its members to negotiate an apportionment agreement that could be the basis for a federal court decree, one would think that the special solicitude we have shown for preservation of the States' apportionment authority would cause the court to demand clearer credentials on the part of those who purport to speak for the legislature.[3] The District Court asserted that "Florida's House and Senate . . . manifested . . . the authority to consent," 920 F. Supp., at 1251, but it points to no resolu-

federal-court invalidation, see *In re Constitutionality of Senate Joint Resolution 2G, supra,* at 544–545.

[3] The Court is of the view that participation by Florida's legislative branches was beside the point, and that the attorney general alone could propose a redistricting plan and settle this lawsuit without participation by the legislature. See *ante,* at 578, n. 5. I know of no support for this proposition, and the Court provides none. Moreover, this view is contrary to that of the District Court. See 920 F. Supp. 1248, 1252–1253, n. 3 (MD Fla. 1996); *id.,* at 1255 ("Foremost among the factors commending the proposed resolution in this action is the consent of Florida's Senate and House . . ."); *ibid.* ("[P]roposed District 21, like present District 21, is primarily a *legislative action* and is advanced . . . by this court preeminently for that reason" (emphasis added)).

tion conferring such authority upon the individual legislators before the court; and as to the Senate, at least, there is some evidence no such authority exists. The record contains a letter from State Senator Howard C. Forman to the District Court reading in part as follows:

> "This letter is intended to communicate to you in the strongest possible terms that the Florida Senate has not agreed to any proposed settlement. As a constitutionally established collegial body, the Florida Senate can agree to nothing without open debate and action by the entire body. As a duly elected Member of the Florida Senate, I have never waived my constitutional duty and responsibility to participate in all Senate matters. And, under no circumstances does any individual Senator, or group of individual Senators, have the right to agree to anything in my name. . . .
>
> "Therefore, I challenge any representation that the Florida Senate has agreed to any proposed settlement in this case." Record 152.

But in fact all these inquiries into authorization to enter private agreements are supererogatory. Even an *authorized* private agreement cannot serve as the basis for a federal apportionment decree. We have said explicitly, and in unmistakable terms, that "[f]ederal courts are *barred* from intervening in state apportionment in the absence of a *violation* of federal law." *Voinovich* v. *Quilter*, 507 U. S. 146, 156 (1993) (emphasis added). As Chief Judge Tjoflat's concurrence below correctly stated, "to enter the judgment in question, the court must find that District 21 is unconstitutional." 920 F. Supp., at 1256–1257. I would adhere to that principle.

Finally, I find no merit in the Court's apparent suggestion, *ante,* at 578–580, that appellant has no standing to complain of this defect. A judicial decree entered without jurisdiction has mooted his suit. Surely that is enough to sustain his appeal.

## II

The District Court's failure to find the pre-existing District 21 unconstitutional is alone enough to require reversal of the judgment. But the District Court committed a second error, in failing to give the Florida Legislature the opportunity to redraw the district before imposing a court-ordered solution. We have repeatedly emphasized that federal interference with state districting "represents a serious intrusion on the most vital of local functions," *Miller* v. *Johnson*, 515 U. S. 900, 915 (1995), and that "reapportionment[, which] is primarily the duty and responsibility of the State," *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975), " 'is primarily a matter for legislative consideration and determination,' " *Connor* v. *Finch, supra,* at 414 (quoting *Reynolds* v. *Sims*, 377 U. S. 533, 586 (1964)). " '[J]udicial relief becomes appropriate,' " we have said, " 'only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' " *White* v. *Weiser, supra,* at 794–795 (quoting *Reynolds, supra,* at 586). See also *Growe* v. *Emison*, 507 U. S. 25, 33–34 (1993); *Upham* v. *Seamon*, 456 U. S. 37, 41–42 (1982) *(per curiam); McDaniel* v. *Sanchez*, 452 U. S. 130, 142 (1981); *Wise* v. *Lipscomb*, 437 U. S. 535, 540 (1978) (opinion of White, J.). The District Court's failure to give Florida a reasonable opportunity to craft its own solution after a judicial finding that the current districting was unconstitutional—or even (since here such a finding was never made) after the judicial finding that a constitutional claim is "fairly litigable"—was most assuredly error.

The District Court repeatedly referred to Plan 386 as a "legislative solution," 920 F. Supp., at 1255, and the concurrence described it as a "plan that the Florida legislature has proposed," *id.,* at 1257. But judicial characterization does not overcome reality. The fact that the Speaker of Florida's House of Representatives and the President of Florida's Sen-

ate participated in the negotiations and consented to the settlement does not magically convert Plan 386 into a Florida law. The "opportunity to apportion" that our case law requires the state legislature to be afforded is an opportunity to apportion through normal legislative processes, not through courthouse negotiations attended by one member of each House, followed by a court decree.

Appellees contend that the District Court actually offered the legislature the opportunity to redistrict, but that the legislature declined. This contention is based upon the fact that the representatives of the Florida Legislature informed the District Court, prior to any proceedings on the merits, that the legislature would likely not *sua sponte* redraw the districts in response to *Miller* v. *Johnson, supra,* and on the status reports filed by the Florida Senate, see *ante,* at 578, n. 5. But the requisite opportunity that our cases describe is an opportunity to redraw districts after the extant districts have been ruled unconstitutional—not after a Supreme Court case has been announced which may or may not ultimately lead to a ruling that the extant districts are unconstitutional. See, *e. g., Growe, supra,* at 34; *McDaniel, supra,* at 142; *Reynolds, supra,* at 585–586. The State is under no obligation to redistrict unless and until a determination has been made that there has been a violation of federal law.

\* \* \*

Because the District Court lacked the authority to mandate redistricting without first having found a constitutional violation; and because the District Court failed to give the State an opportunity to redistrict on its own after notice of the constitutional violation (or even after notice of the court's intention to proceed with its own plan), I would reverse the judgment of the District Court and remand for further proceedings. Given my conclusion on appellant's first two challenges to the District Court's judgment, I have no occasion

590

to consider the constitutionality of the court-drawn district, Plan 386.

I respectfully dissent.